730 So.2d 890 (1999)
ENTERGY GULF STATES, INC.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 98-CA-1235.
Supreme Court of Louisiana.
April 16, 1999.
Rehearing Denied May 28, 1999.
*894 L. Richard Westerburg, Jr., Baton Rouge, Stephen Thomas Perrien, Monroe & Lehmann, New Orleans; J. Wayne Anderson, Kathryn J. Lichtenberg, Margot Gallup Augustin, New Orleans, Counsel for Applicant.
Michael R. Fontham, Baton Rouge, Laurie A. Barcelona, Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans; Suzanne Mary Ciaccio, Brian Andrew Eddington, Eve Kahoa Gonzalez, Baton Rouge, Noel J. Darce, New Orleans, Counsel for Respondent.
CALOGERO, Chief Justice.[*]
This appeal is taken by Entergy Gulf States, Inc. from a judgment of the Nineteenth Judicial District Court affirming Order No. U-21485 by the Louisiana Public Service Commission in which the Commission directed the appellant Company, based upon the 1994 test year, to refund $9.635 million to its customers and to reduce base rates prospectively by $33.275 million. Challenging the entire $9.635 million refund and $26.850 million of the prospective base rate reduction, the Company has appealed the district court judgment directly to this Court pursuant to La. Const. Art. IV, § 21(E). Accordingly, we now address a multitude of ratemaking decisions adverse to the Company, including the Commission's exclusion from the Company's base rate of certain operations and maintenance expenses, accumulated deferred income taxes, and short-term construction work in progress; the Commission's use of the Consumer Price Index, as opposed to a higher rate of inflation, to determine the future cost of decommissioning a nuclear power plant; the Commission's use of gross, rather than net, proceeds of debt in the Company's capital structure; and the Commission's implementation of adjustments retroactive to the date the Company filed its revenue requirement. Additionally, we address the district court's ruling excluding certain additional evidence proffered by the Company on appeal to the district court.
After a thorough review of the record, briefs, and relevant authorities, we reverse that part of the $33.275 million prospective rate order removing from the Company's Louisiana jurisdictional revenue requirement $6.116 million related to 1994 operations and maintenance expenses incurred to produce savings, and remand the case to the Commission for a determination of the appropriate amortization period for the recovery of these costs. We further reverse the $9.635 million refund order to the extent that it includes $3.643 million related to the revenue annualization adjustment. In all other respects, Order No. U-21485 is affirmed. Additionally, the district court's ruling excluding additional evidence proffered by the Company regarding the proper capital structure to be employed is affirmed.
La. Const. Art. IV, § 21(B) grants the Commission "broad and independent regulatory powers over public utilities." Additionally, La.R.S. 45:1163(A)(1) provides that "[t]he commission shall exercise all necessary power and authority over any ... local public utility for the purpose of fixing and regulating the rates charged or to be charged by... such public utilities." La.R.S. 45:1167 further requires that the Commission promulgate "reasonable and just rules, regulations and orders." Pursuant to these regulatory powers, the Commission has "exclusive jurisdiction, in the first instance, to fix or change any rate to be charged by a public utility." Daily Advertiser v. Trans-La, 92-0988 & 92-1001, 612 So.2d 7, 16 (La.1/19/93) (citing Gulf States Utils. Co. v. Louisiana Pub. Serv. Com'n, 578 So.2d 71, 100(La.1991), cert. denied, 502 U.S. 1004, 112 S.Ct. 637, 116 L.Ed.2d 655 (1991)).
When fixing the rates to be charged by an electric utility, the Commission determines annually the appropriate "base rate," which is the rate charged per unit of electricity. Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm'n, No. 98-0881 (La.1/20/99), 726 So.2d 870. The base rate should allow the utility to recoup its revenue requirement, i.e. "sufficient revenues to meet its operating expenses, provide its shareholders with a reasonable rate of return, and attract new capital." Central La. Elec. Co. v. *895 Louisiana Pub. Serv. Comm'n, 508 So.2d at 1365 (La.1987). Mathematically, the utility's revenue requirement is the sum of the utility's operating expenses and its rate of return times the amount of its rate base. Operating expenses include "maintenance, depreciation, and taxes, incurred to produce revenues;" rate base is "the value of the property, plant and equipment (less accumulated depreciation) which provide the service, and on which a return should be earned;" and rate of return is "a percentage figure which, when applied to the rate base, will generate revenues sufficient to cover costs and give investors a fair return on their investment." Id.
In addition to the above Constitutional, legislative and jurisprudential authority, the rate order at issue in this appeal is also governed in part by a previous Commission order, Order No. U-19904 (the "Merger Order"), in which the Commission approved, subject to conditions, the merger of Entergy Corporation ("Entergy") with Gulf States Utilities Company ("Gulf States"), two companies doing business in Louisiana and regulated by the Commission. In the Merger Order, the Commission concluded that the companies' merger was in the public interest partly because Entergy would be able to reduce nonfuel operation and maintenance ("O & M") expenses by restructuring operations and introducing other efficiencies. These cost reductions, or "savings," could then be passed on to ratepayers and investors.
In order to compensate Entergy for the premium it would pay to acquire Gulf States,[1] Entergy had proposed that these O & M savings be added to the operating expenses recoverable through base ratesover and above the actual expenses experienced by Entergyover eight years, through an amortization schedule.[2] Entergy first proposed that a fixed amount be amortized based on its then-available estimates of anticipated future savings. The Commission Staff was concerned, however, that Entergy's estimates of potential savings were inflated or unrealistic. Accordingly, the Commission rejected Entergy's proposed fixed amortization schedule. Instead, the Commission Staff offered, and Entergy accepted, a different plan in which the actual savings achieved by the Company over an eight year period are calculated using a savings tracker mechanism described in the Joint Regulatory Proposal (the "Proposal"), an appendix to the Merger Order containing conditions to the merger. Pursuant to the savings tracker mechanism, savings are calculated according to a formula comparing base year normalized O & M expenses with future year normalized O & M expenses. To the extent that the merger produces O & M savings in a year, sixty percent of those savings allocable to Louisiana retail operations will be treated as legitimate and prudent expenses are treated, that is, included in any Louisiana jurisdictional revenue requirement based upon that year as a test year. In sum, for seven consecutive post-merger years, the Company may recoup through base rates sixty percent of O & M savings flowing from the merger. The remaining forty percent of merger savings would contribute to lower rates and thereby benefit ratepayers. By this agreement, the Commission noted that:
Entergy literally is putting its money where its mouth is, relying on its own ability to cut costs as the means to collect the premium. This decision is credible evidence that Entergy expects to produce savings; it also provides a substantial incentive to Entergy to fulfill its predictions.
In view of these facts, the Commission concludes that Entergy will achieve nonfuel operation and maintenance cost reductions in its operation of GSU. For Entergy to collect the full amount it originally wished to amortize, it will have to exceed its predictions.
L.P.S.C. Order No. U-19904 at 73.
To ensure that savings and other cost reductions are in fact passed on to ratepayers *896 for an eight year period, the Proposal outlines an annual earnings review procedure. Under that procedure, the Company files with the Commission a Louisiana jurisdictional revenue requirement analysis based on data for the previous calendar year, or "test year." The Proposal further provides that, following the initial filing based on the pre-merger test year (1993), the Company must file, within five months after the end of each of the next seven post-merger calendar years, a Louisiana jurisdictional revenue requirement analysis based on data for the respective test year.
The Proposal further requires that the following principles apply to the annual savings and rate review:
a) The cost of equity will be reviewed no less frequently than every other year. Any party can request a change in the approved cost of equity in any annual review. All other cost of capital components will be reviewed annually;
b) The Company will not be allowed to defer O & M expense for the purpose of computing savings under the [the O & M savings tracker] mechanism ...;
c) The Commission shall retain the right to review the accounting practices of the Company to ensure that they are consistent with [Generally Accepted Accounting Principles] and sound regulatory principles and practices; and
d) The Commission shall retain the right to review the prudence of capital expenditures consistent with traditional regulatory principles.
The Commission reviews each filing, makes appropriate adjustments, and issues a rate order. The order on appeal, Order No. U-21485, is the rate order issued by the Commission following the second annual review of the Company's earnings.[3]
The Company timely filed its second annual Louisiana jurisdictional revenue requirement analysis on May 31, 1995 based on a test year ending December 31, 1994. According to the Company's analysis, its actual revenues were insufficient to meet its revenue requirement. Thus, according to the Company, a base rate reduction in any amount was not in order.[4] The Commission contested several aspects of the filing. The matter went before Administrative Law Judge Carolyn L. DeVitis who issued her Proposed Recommendation on May 28, 1996. After she issued her Proposed Recommendation, this Court rendered its decision in the prior year's earnings review (based on the 1993 test year) which resolved certain contested issues in the instant earnings review. See Gulf States Utils. Co., 676 So.2d 571. The Company and Commission Staff filed exceptions to Judge DeVitis' Proposed Recommendation. Judge DeVitis issued her Final Recommendation on August 7, 1996. The Commission adopted her recommendation in full in its rate order. The rate order imposes a retroactive rate change, which would reduce base rates charged by the Company from June 1, 1995 through May 31, 1996 by $9.635 million, a sum which would be refunded to customers in the form of credits on their bills. This amount represents a base rate reduction which, according to the Commission, should have been implemented as of June 1, 1995 under the terms of the Merger Order. In addition, the Commission ordered the Company to "reduce its base rates by $33.327 million annually." L.P.S.C. Order U-21485 at 18.
*897 The Company filed an appeal in the Nineteenth Judicial District Court, which affirmed the Commission order, finding that it was fully supported by the evidence and was not arbitrary or capricious in any respect. Pursuant to the district court's grant of a preliminary injunction, which was unopposed by the Commission, both the prospective and retroactive rate reductions were enjoined pending a final judgment by this Court in the instant appeal.
The Company raises nine assignments of error challenging the entire $9.635 million refund and $26.850 million of the $33.275 million prospective rate reduction. Specifically, the Company argues that the Commission erred by (1) disallowing 1994 O & M expenses incurred to produce future savings; (2) disallowing nuclear O & M expenses deemed "excessive"; (3) using a general rate of inflation to escalate nuclear decommissioning costs in calculating the Company's decommissioning accrual; (4) excluding from the Company's rate base accumulated deferred income taxes associated with net operating losses and alternative minimum tax; (5) excluding short-term construction work in progress not accruing Allowance for Funds Used During Construction from the rate base; (6) reflecting the gross proceeds of debt in the Company's capital structure, rather than including the net proceeds of debt; (7) ignoring the Company's request that undisputed corrections be reflected in its revenue requirement; and (8) requiring the Company to implement certain adjustments retroactively through a refund to customers. The Company's ninth assignment of error is that the district court erred in refusing to admit additional evidence pursuant to La.R.S. 45:1194.
The standard for judicial review of rate orders by the Commission is well-settled. Recently, this Court observed that:
Initially, as the orders of the Commission are entitled to great weight, they should not be overturned absent a showing of arbitrariness, capriciousness, or abuse of authority by the Commission. Secondly, courts should be reluctant to substitute their own views for those of the expert body charged with the legislative function of rate-making. Lastly, a decision of the Commission will not be overturned absent a finding that it is clearly erroneous or that it is unsupported by the record.
Gulf States Utils. Co., 676 So.2d 571 (quoting Central La. Elec. Co. v. Louisiana Pub. Serv. Comm'n, 508 So.2d 1361, 1364 (La. 1987)). This Court has further opined that:
The Commission is an expert within its own specialized field and its interpretation and application of its own General Orders, as distinguished from legislative statutes and judicial decisions deserve great weight, because the Commission is in the best position to apply its own General Orders.
Dixie Elec. Membership Corp. v. Louisiana Pub. Serv. Comm'n, 441 So.2d 1208, 1210 (La.1983) (citing Central La. Elec. Co., Inc. v. Louisiana Pub. Serv. Comm'n, 370 So.2d 497 (La.1979)). Thus, the deference accorded the Commission's orders extends also to the Commission's interpretation of its own rules and past orders. Entergy Gulf States, Inc. v. Louisiana Pub. Serv. Comm'n, 98-0881 (La.1/20/99), 726 So.2d 870. In sum, the courts must affirm the Commission's rulings unless they are arbitrary or capricious, an abuse of authority, unsupported by the record, or clearly erroneous.

1. 1994 Operations & Maintenance Expenses
In its first assignment of error, the Company contends that the Commission erred by disallowing $6.116 million in 1994 O & M expenses "incurred to produce future O & M savings," more particularly, expenses attributed to employee severance costs, employee benefit costs, and costs associated with consolidating business offices. The Company proposed that some expenses be deferred and amortized over three years and others over five years, so that the Company would recover these expenses through base rates over the period of time during which the savings would be realized.
Initially, the Commission's expert witness, Mr. Lane Kollen, opposed the Company's request to amortize some of the expenses over three years and others over five years. Rather, he argued that they should all be *898 amortized over five years. Nonetheless, Mr. Kollen acknowledged that the ratepayers should share in bearing these expenses because the ratepayers stand to benefit from the resultant savings. Even in the Commission Staff's Post-hearing Brief to the Commission, the Staff argued that deferral of the expenses with a five year amortization was the more reasonable treatment. The Staff stated:
The five year amortization is reasonable, because it more fairly matches the amortization period with the savings created by the nonrecurring costs. The company seeks recovery of these merger related costs because they will produce savings.... A matching of the amortization period with the savings period would be reasonable. Thus, Mr. Kollen's five-year amortization is reasonable.
Post-Hearing Brief on Behalf of the La. Pub. Serv. Comm'n of 2/23/96, at 20 (citations omitted). Because the Staff, its expert, and the Company all advocated recovery of these expenses, neither the Company nor the Staff presented evidence on the propriety of totally disallowing the expenses. Nonetheless, the issue went before the ALJ, who declined to recommend any amortization. Instead, she recommended disallowing entirely the relevant 1994 O & M expenses. The Commission adopted the recommendation and reasoning of the ALJ.
In the rate order, the Commission essentially provided four reasons for disallowing the 1994 O & M expenses.[5] The Commission first points to the following provision of the Proposal: "The Company will not be allowed to defer O & M expense for the purpose of computing savings under the mechanism set forth in Attachment A [the O & M savings tracker]." L.P.S.C. Order No. U-19904, Appendix 1. The Commission contends that an expense must be deferred on the Company's books for later collection in order to be amortized over a number of years. Because O & M expenses cannot be deferred for the purpose of computing savings according to the Proposal, the Commission concludes that deferral of O & M expenses in order to facilitate recovery of these costs is equally impermissible. On the other hand, the Company contends that this provision addresses only the effect of deferring O & M expenses on the computation of savings pursuant to the merger savings tracker. In other words, according to the Company, the provision says only that the Company cannot defer O & M expenses for the purpose of determining the amount of savings in a given test year; the provision does not address whether O & M expenses themselves may be amortized and recovered in rates over forthcoming years, and it says nothing to justify a disallowance of costs in calculating the Company's revenue requirement.
We agree with the Company on this point. When a Commission order adopts an agreement between a utility and the Commission, this Court cannot unjustifiably disregard the parties' intentions or the plain language of the agreement to uphold the Commission's interpretation of the order, even though the Commission's interpretation of its own orders generally deserves great weight. The Commission cites no evidence in the record[6] or other authority supporting *899 its contention that the Proposal precludes recovery of O & M expenses incurred to produce savings. Instead, the language in the Proposal expressly precludes deferral of O & M expenses "for the purpose of computing savings," not for the purpose of determining whether O & M expenses incurred to produce future savings are recoverable. In fact, the experts on both sides recommended recovery of the 1994 O & M expenses. The Commission Staff's expert, Mr. Kollen, acknowledged that this provision of the Proposal was intended to prevent the Company from deferring O & M expenses for the purpose of artificially creating or increasing purported savings by understating test year expenses in the tracker calculation. Dir. Test Mr. Kollen at 10, L.P.S.C. (10/95). For example, the amount of savings under the tracker would be increased if the Company deferred the incurrence of O & M costs, or the ratemaking recognition of these costs, until after the end of the seven-year period during which savings will be measured. Because O & M expense would be reduced in the year in which such costs are deferred, measured savings would be increased for that year. Mr. Kollen explicitly recognized that the Company did not have this impermissible purpose in mind and that its filing did not attain this impermissible result. Id. After reviewing the record, we find no reason not to apply the express language of the provision as written. Accordingly, we find that the Commission's reliance on this provision is not based on the record, and it is arbitrary and capricious.
Second, the Commission reasons that the Company can recoup the O & M expenses incurred to produce savings through the merger savings tracker, which allows the Company to keep sixty percent of savings resulting from the mergersavings which will recur annually. The Company contends that it is unfair to disallow recovery of these expenses simply because the Company recoups sixty percent of merger-related O & M savings. These savings, the Company asserts, were solely intended to recompense the Company for the premium Entergy paid to acquire the stock of Gulf States.
Again, we agree with the Company. Entergy agreed to pay $20 per share for Gulf States, an amount in excess of the market price and book value of the stock when the offer was made. L.P.S.C. Order No. U-19904 at 82. According to the Merger Order, the Commission understood that "Entergy seeks to recover ... the premium it will pay for the stock through a mechanism for sharing the savings it expects to realize from the merger." Id. The Commission further recognized that the merger savings would be the shareholders' sole compensation for the premium paid by Entergy to acquire Gulf States' stock. In the Merger Order, the Commission cited the testimony of Mr. Richard D. Treich, who noted:
The regulatory treatment proposed in connection with this Joint Application would allow the investors to be compensated for assuming that risk and would encourage them to assume that risk, as a means of creating the significant savings that will be made available to Gulf States' customers. The compensation to which the investors would be entitled would not be guaranteed to those investors, but would only be available out of savings for which management would be at risk and for which base rates would not be increased.
L.P.S.C. Order U-19904 at 82-83 (emphasis added). The Merger Order also states that "[t]he plan to allow shareholders to keep 60 percent of O & M cost savings allows them a reasonable opportunity to recover the premium included in their investment, without which their would be no merger savings." Id. at 85. The Commission reasoned that the savings tracker mechanism permitting Entergy to share only in the savings actually achieved "provides a substantial incentive to Entergy to fulfill its [savings] predictions." Id. at 73. We find that the Commission's proposal that the merger savings be used to pay for O & M expenses ascribable to merger savings controverts the intentions of the parties in the Proposal. The parties agreed *900 that the merger savings would be used solely to compensate Entergy's shareholders for the acquisition premium. Accordingly, we find no merit to the Commission's second reason.
Third, the Commission reasoned that the expenses were functionally equivalent to the 1993 merger-related O & M expenses that were disallowed in the first year's earnings review rate order, Order No. U-19904-C, and should accordingly be disallowed in this second year's earnings review as well. In the first earnings review based upon the pre-merger 1993 test year, the Company included 1993 directors and shareholders expenses in its filings. The Commission, however, disallowed the expenses, and the Company did not appeal. The Company asserts that the disallowed 1994 O & M expenses are dissimilar to the 1993 O & M expenses, which included payments made to officers of Gulf States prior to the merger. The 1993 O & M expenses had been disallowed, the Company argues, because they were perceived as increasing the premium paid by Entergy for which it had agreed not to seek base rate recovery. Because the 1994 O & M expenses at issue were incurred after closing of the merger, the Company argues they could not have contributed to the premium paid by Entergy.
The Commission does not assert in its brief to this Court that the previous order addressing 1993 O & M expenses has the effect of res judicata. Moreover, the 1994 O & M expenses at issue were disallowed for totally distinct reasons. In the Merger Order following the first earnings review, the Commission disallowed 1993 O & M expenses based upon the testimony of Mr. Kollen, who, incidentally, recommended recovery of the 1994 O & M expenses. L.P.S.C. Order No. U-19904-C at 28. In disallowing recovery and deferral of the expenses, the Commission stated:
Since these personnel costs were expenses by Gulf States prior to the merger, the costs effectively increased the acquisition adjustment paid by Entergy for the Gulf States stock. Accordingly, Mr. Kollen found that these costs were part of the acquisition adjustment and were not recoverable from the Louisiana retail cost of service and not be deferred..... The Commission adopts Mr. Kollen's recommendation.
Id. at 64. The Commission's exclusion of pre-merger 1993 O & M expenses does not support the Commission's disallowance of the post-merger 1994 O & M expenses, which did not affect the premium Entergy paid for Gulf States' stock. Accordingly, we find the Commission's reliance on this argument is arbitrary and capricious.
Fourth, the Commission contends that the 1994 O & M expenses were properly disallowed because they were abnormal and nonrecurring. The Commission asserts that disallowance of abnormal and nonrecurring expenses is consistent with the general rule against retroactive ratemaking, which "occurs when a utility is permitted to recover an additional charge for past losses...." South Central Bell Tele. Co. v. Louisiana Pub. Serv. Comm'n, 594 So.2d 357, 359 (La. 1992). Under this rule, test year data should be representative of conditions prevailing in the immediate future when the rate will be effective. Central La. Elec. Co., 508 So.2d at 1369. In Central Louisiana Electric Co., this Court observed that:
[t]he test year is merely a tool. Thus, test year data should not be looked at in isolation or arbitrarily applied. Instead, "[e]very aspect of the utility's operations during the test year must be examined in order to determine the extent to which the figures it has received from the utility are representative of the figures that will, or should prevail in the future." When it is apparent the test year data provides an inaccurate forecast of the future, adjustments should be made so as to provide a reasonably accurate estimate of future operating conditions.
Id. (citations omitted). The Commission relies upon this Court's opinion in the first earnings review for the 1993 test year, in which we disallowed litigation expenses in part because they were "unusual and not likely to recur." Gulf States Utils. Co., 676 So.2d at 579-80. The Commission also cites Southern Bell v. Louisiana Pub. Serv. Comm'n, 239 La. 175, 118 So.2d 372, 384 *901 (La.1960), where we upheld a Commission order disallowing advertising expenses because they were abnormal and nonrecurring, and because "their inclusion in the operating expense accounts would distort test year earnings." Moreover, the Commission argues that the parties acknowledged that the expenses were abnormal and nonrecurring. In fact, the record reflects that the Company's expert, Mr. David Wright, did indeed testify that the expenses were unusual and nonrecurring:
Q. Okay. So merger-related early retirement and termination expenses are unusual and nonrecurring; right?
A. Yes. They are also a cost incurred and necessary for the company to achieve the savings that the company has predicted down the line.
Cross Exam. Mr. Wright at 849-50, L.P.S.C. (1/16/96).
We find the cases cited by the Commission supporting the disallowance of abnormal and nonrecurring expenses distinguishable under the unusual circumstances of the Proposal. Under this agreement, the Commission rewards the Company for reducing O & M expenses by allowing it keep sixty percent of the savings as its sole reimbursement for the premium paid by Entergy for Gulf States' stock. Significantly, the Commission reasoned that "[t]he rate plan also benefits ratepayers... by providing for annual review that will flow through their share of the savings ... Ratepayers can only benefit from this process." L.P.S.C. Order No. U-19904 at 85 (emphasis added). Thus, the Merger Order induces the Company to incur abnormal and nonrecurring expenses to create savings that benefit ratepayers, as well as the Company.
This Court most recently addressed unusual and nonrecurring expenses in Gulf States Utils. Co., 676 So.2d at 579-80, which involved the first earnings review following the Merger Order. In that case, Gulf States asserted that the Commission erred by disallowing $1.73 million in litigation expenses incurred in its defense of a fraud suit brought by Cajun Electric Power Cooperative. The expenses were not incurred to produce savings pursuant to a plan similar to the Proposal. We upheld the Commission's order for two reasons. First, we reasoned that any judgment in the case against Gulf States would have affected its shareholders, not the ratepayers, due to the underlying allegations of fraud. Therefore, the defense of the suit "benefitted [Gulf States'] shareholders, not the ratepayers." Id. at 579 (emphasis added). Second, we noted that "it appears that these litigation expenses were unusual and not likely to recur." Id.
In Southern Bell Telephone & Telegraph Co., 118 So.2d at 384, also cited by the Commission, the facts further suggest that the expenses did not benefit ratepayers. Moreover, the expenses were not incurred to produce future savings pursuant to a plan similar to the Proposal. In that case, the Commission disallowed $225,000 during the test year for advertising expenses incurred to inform the public of the utility's position pending its application for a rate increase. Id. We stated that other jurisdictions "condemn the practice of utilities in using the ratepayer's money to conduct an advertising campaign to increase the rates." Id. Accordingly, we affirmed the Commission's order disallowing the expenses because they were "abnormal and nonrecurring in character." Id.
The case sub judice is quite distinguishable from these cited cases. The ratepayers benefit substantially from O & M expenses incurred to produce savings pursuant to an agreement between the Commission and the Company. It is this benefit that convinced the Commission, in part, to adopt the Merger Order and Proposal. It is unreasonable to disallow totally the expenses prudently incurred to produce savings for the benefit of the Company and the ratepayers, which is the object of the Merger Order and Proposal. Thus we also find the Commission's position in this regard untenable.
Because we find all of the Commission's reasons for disallowing the 1994 O & M expenses incurred to produce savings to be either arbitrary or capricious or unsupported by the record, we remand this portion of the case to the Commission for further proceedings to determine the appropriate amortization period for recovery of these expenses.

*902 2. Nuclear O & M Expenses

In its second assignment of error, the Company contends that the Commission erred by disallowing $3.5 million in nuclear O & M expenses incurred to operate the Company's River Bend Nuclear Generating Station, Unit 1 ("River Bend"). The Commission disallowed the expenses because they were excessive, and because they were unique and nonrecurring. L.P.S.C. Order No. U-21485 at 15.
In determining that the expenses were excessive, the Commission relied in part upon four comparisons made by Mr. Kollen, noting that "in each instance 1994 O & M costs were higher than the comparative group." Id. According to Mr. Kollen's comparisons, 1994 River Bend nuclear O & M expenses were (1) 28.6%, or $20.896 million, higher than the 1994 O & M expenses of a peer group of nuclear generating units, (2) 130%, or $53.58 million, higher than 1994 O & M expenses of Waterford 3, Entergy's nuclear generating unit with the second highest O & M costs, (3) 22.5%, or $17.41 million, higher than its own 1994 O & M budget, and (4) 14.8%, or $12.196 million, higher than the Company's projected costs submitted to the Commission during merger proceedings, and relied upon by the Commission in conditionally approving the merger. Supp. Dir. Test. Mr. Kollen at 2, L.P.S.C. (11/6/95).
The Company takes issue with Mr. Kollen's comparisons and his opinion that the excessive expenses resulted from imprudent outages and poor performance. Mr. John McGaha, Vice-President of Operations at River Bend, testified that Mr. Kollen's comparison of River Bend O & M expenses with expenses of a peer group is flawed, because the peer group omitted three plants that should have been included, which would have reduced by almost 14% the difference between River Bend and peer group O & M expenses.[7]Rebuttal Test. Mr. McGaha at 20, L.P.S.C. (11/27/95). The Company further contends that this comparison failed to account for the increased level of O & M expenses typically incurred by a plant which experiences a refueling outage during the test year. Plants such as River Bend, which had a refueling outage in 1994, will likely compare unfavorably to plants that did not have a refueling outage due to increased costs and decreased plant capacity.[8] In support of these contentions, Mr. McGaha testified that Mr. Kollen's peer group failed to include the Fermi 2, Pilgrim, and Millstone Unit 1 plants, and that Fermi 2 was down for all of 1994 for an outage to repair its turbine. Id.
Mr. Kollen responded to Mr. McGaha's criticism of the selection of comparative nuclear facilities. He testified that:
I utilized all domestic single boiling water reactors over 500 mW that actually operated during the test year. Fermi 2 was not included because it did not operate during 1994. Millstone 1 was not included because it is not a single unit. It shares a site with Millstone 2. However, the Pilgrim unit was unintentionally excluded. It should have been included in the comparative group.
Surrebuttal Test. Mr. Kollen at 29, L.P.S.C. (12/11/95). Mr. Kollen then testified that he included the Pilgrim unit in a revised comparative analysis which indicated that River Bend's 1994 O & M expenses were $17.983 million higher than those of the peer group, and that the revised computation does not change his recommendation to disallow the nuclear O & M expenses. Id. at 30.
*903 The Company contends that the Commission also erred by relying upon Mr. Kollen's conclusion that River Bend's nuclear O & M expenses were excessive when compared to Entergy's other nuclear plants because two of those plants are pressurized water reactors, whereas River Bend is a boiling water reactor. The Company contends that Mr. Kollen failed to make adjustments in his comparison based upon these different designs, and that this failure contradicts his first comparison which used only nuclear units of a similar design. In response, Mr. Kollen testified that he simply made several comparisons on different bases to conclude and illustrate that the test year O & M expenses for River Bend were excessive. Surrebuttal Test. Mr. Kollen at 30, L.P.S.C. (12/11/95).
Regarding Mr. Kollen's third conclusion, that River Bend's 1994 nuclear O & M expenses were excessive because they were 22.5% higher than the Company's 1994 O & M budget, Mr. McGaha testified that Mr. Kollen compared actual 1994 O & M spending to internal targets set for River Bend that were lower than the actual corporate budget. "If Mr. Kollen had made an appropriate comparison," argues Mr. McGaha, "then he would have discovered that the actual O & M expense was only $7.7 million higher than the budget." Rebuttal Test. Mr. McGaha at 23, L.P.S.C. (11/27/95). The Company contends that this variance, about 6%, is reasonable.
The Company further contests Mr. Kollen's final comparison of the 1994 River Bend O & M expenses with the Company's projected costs submitted to the Commission during merger proceedings. It is this comparison on which Mr. Kollen, and ultimately the Commission, relied to disallow the $3.5 million, which reflects the excessive actual costs over the level presented by the Company and relied upon by the Commission in the merger proceeding. See Supp. Dir. Test. Mr. Kollen at 5, L.P.S.C. (11/6/95). Mr. McGaha testified that it is arbitrary and unfair to hold the Company liable for amounts that exceed this early estimate which was based on limited information, mainly publicly available information on Gulf States. The Company urges that these old projections are not properly relied upon now for ratemaking purposes, simply because the Commission chose to rely upon them earlier.
In addition to inferring from these comparisons that the O & M expenses were excessive, the Commission reasoned that the O & M expenses were excessive due in part to remedial measures taken by the Company to correct the plant's poor performance. The Commission stated that:
GSU's self assessment was that management had not established high standards and expectations and effectively communicated them throughout the plant, there were human performance weaknesses, and procedure, maintainability, and backlogs. It does appear that 1994 River Bend O & M was so high at least partly because of the necessity to correct existing problems.
L.P.S.C. Order No. U-21485 at 15 (citations omitted). In fact, Mr. McGaha attested to a variety of internal management and operational problems that existed in 1993 and 1994,[9] which resulted in a higher number of *904 corrective actions taken during 1994 to address problem areas. Cross Exam. Mr. McGaha at 269, L.P.S.C. (12/19/95). Mr. McGaha characterized 1994 as "a tumultuous time" and "an unusual transition year," Id. at 270, and stated that O & M expenses for 1994 were higher than those in 1995 due to the amount of work and improvement activities the Company planned for the year, Id. at 233.
The Company contends, however, that the record reveals no evidence that any particular O & M activity or project undertaken at River Bend during the test year was imprudent. Rather, all O & M expenses incurred to improve performance were reasonable, necessary, and prudent, and that River Bend's post-test year performance has improved as a consequence of these expenses. By disallowing the expenses, the Company argues that the Commission is effectively penalizing the Company for implementing programs designed to attain excellence.
On the other hand, the Commission reasons that the declining post-test year O & M expenses is but another factor suggesting that the 1994 O & M expenses were excessive. Furthermore, the Commission agrees with Mr. Kollen's testimony that:
The ratepayers should not be required to pay for excessive costs or poor performance. The fact that [the Company] has to engage in remedial and improvement work to bring the unit to acceptable performance is not the responsibility of ratepayers but, rather, the Company itself. Due to the unit's poor performance, the Company can't even reasonably argue that the unit has generated fuel savings sufficient to justify the excessive [nonfuel] O & M expenses.
Supp. Dir. Test. Mr. Kollen at 4, L.P.S.C. (11/6/95).
Utilities have an obligation to manage their facilities efficiently. The utility must make reasonable attempts to minimize costs through prudent decision making, since ratepayers depend on only one monopolistic supplier. Gulf States Utils. Co. v. Louisiana Pub. Serv. Comm'n, No. 96-2046 (La.2/25/97), 689 So.2d 1337, 1346 & n. 9.
Therefore, the proper standard for determining whether a utility was imprudent is whether objectively that utility acted reasonably under the circumstances, because only the utility, and not the ratepayer, is in a position to minimize imprudence and maximize efficiency. A finding of unreasonableness, and therefore imprudence, by the Commission, will be upheld unless it is "based on an error of law or is one which the Commission could not have found reasonably from the evidence." CTS Enterprises,Inc. 540 So.2d 275.
Id. Here, the Company's own witness, Mr. McGaha, does not dispute that poor management decisions resulted in increased 1994 O & M expenses. His testimony is replete with examples of inefficiencies at River Bend. During the merger proceedings, the Company submitted its projected 1994 River Bend O & M expenses, which the Commission relied upon then to conditionally approve the merger. We do not find that the Commission's reliance on that figure now, given Mr. Kollen's other comparative analyses and the overwhelming evidence that River Bend's poor performance and management resulted in excessive remedial O & M expenses, is arbitrary or capricious, an abuse of discretion, or not based on the record. Because the finding that the 1994 O & M costs were excessive is sufficient support for the disallowance, we pretermit discussion of whether the Commission could properly disallow the expenses as abnormal and nonrecurring.

3. Decommissioning Costs/Rate of Inflation
The Company's third assignment of error alleges that the Commission erred by using the Consumer Price Index Urban ("CPIU") inflation rate of 3.5% to escalate nuclear decommissioning costs, rather than a 5.5% rate of inflation. In the year 2025, River Bend's operating license will expire, requiring the Company to decommission the plant by dismantling it and disposing of all radioactive materials. Decommissioning is scheduled to commence in the year 2023 and conclude in the year 2031. Pursuant to the Commission's approval of the Deregulated *905 Asset Plan,[10] the cost of decommissioning River Bend is allocated between the regulated and deregulated portions. Gulf States Utils., 676 So.2d at 580-81. The funds necessary to pay for the decommissioning of the regulated portion of River Bend are collected through base rates each year and then placed in external trust funds in which earnings also accumulate. In 1990, Entergy submitted a revised decommissioning report which estimates the cost of decommissioning in 1990 dollars at $382 million, including a contingency factor of 20% to 25%. In the instant base rate proceeding, the Commission used a 3.5% rate of inflation to escalate the 1990 cost estimate to the future cost of decommissioning. To arrive at the 3.5%, the Commission relied upon Wharton Econometrics Forecasting Associates ("WEFA"), which projected that the CPIU inflation rate will be 3.5% per year out into the future. Factoring in the CPIU inflation rate to estimate the decommissioning cost of the regulated portion of River Bend, the Commission increased the amount the Company could recover through base rates from $1.124 million to $1.477 million. The Company had requested recovery of $9.02 million, factoring in a 5.5% rate of inflation. In declining the Company's request, the Commission reasoned that:
The Joint Regulatory Proposal Term Sheet establishes that for each year subsequent to the test year, the operation and maintenance expense level will be increased by an inflation factor reflecting the Consumer Price Index (Order No. U-19904, Appendix I). Decommissioning expense was filed as part of operation and maintenance expenses.
[The Company's] own experts, as well as staff, recommend that a decommissioning cost study be performed every three to five years.... A new study should therefore be due in 1995. At that time, new calculations can be made on the best information available as to the current cost of decommissioning the facility. Periodic studies should correct for any imbalances in the decommissioning fund. The costs related to nuclear decommissioning are somewhat speculative in that no decommissioning has actually taken place.... [The 1990 decommissioning cost estimate] includes a contingency amount of twenty to twenty-five percent. While [the Company] argues that this contingency amount is not intended to deal with inflation, it is nonetheless an additional safeguard....
. . .
Current customers should contribute only what would be their portion of the cost if the decommissioning took place today.
L.P.S.C. Order No. U-21485 at 13-14. Additionally, the Commission noted that although the Company is entitled to recover the cost of decommissioning the regulated portion of River Bend, the timing of the recovery is a question of regulatory judgment because the decommissioning will not occur for some time. Id.
The Company asserts that the Commission's reliance on the CPIU is misplaced because, the Company contends, decommissioning costs, such as the cost of disposing of radioactive waste, rise at a higher rate than the price of consumer goods, such as groceries, automobiles, appliances and similar items. The Company presented filed testimony by Mr. Michael Volpi that the estimated cost to decommission River Bend escalated at a rate of 13.7% from $204.1 million in 1985 dollars to $382.5 million in 1990 dollars. According to Mr. Volpi, the general inflation rate measured by the CPIU increased by only about 4.1% annually during the same period. Rebuttal Test. Mr. Volpi at 5, L.P.S.C. (11/13/95). The Company further contends that the Commission approved Louisiana Power & Light's proposal to calculate the Waterford 3 decommissioning cost using an unpublished 5.5% escalation rate in its *906 June 1995 order. See L.P.S.C. Order No. U-20925 at 22. Moreover, the Company contends that the Commission erred by relying on the merger savings tracker, which uses the CPIU to escalate base year O & M expenses to determine savings, because decommissioning costs are not mentioned in the tracker or included in any calculation pursuant to the tracker. Additionally, the Company argues that the contingency factor included in the cost estimate is intended to address potential inaccuracies in the estimates of current dollar dismantling and disposal costs not errors in the rate of inflation. Finally, the Company asserts that it is unreasonable to rely upon future decommissioning cost estimates to correct any underrecovery resulting from applying a 3.5% rate of inflation. The Company reasons that, by minimizing costs paid by today's ratepayers, the Commission is circumventing the fundamental goal of accruing decommissioning costs over the life of the plant.
In response, the Commission relies upon the testimony of Mr. Stephen J. Baron, who testified that there is no reason to anticipate that historical trends in decommissioning cost estimates will bear any relationship to the future. Dir. Test. Mr. Baron at 13, L.P.S.C. (10/95). According to Mr. Baron's filed testimony, the use of a 5.5% escalation factor would unjustifiably double the real cost of the 1990 study:
Q. Do you believe that there is any basis for assuming a 5.5% escalation factor in the 1990 decommissioning cost estimates for [the Company]?
A. No. For the purposes of the revenue requirement analysis, I believe that it is appropriate to utilize a general inflation factor to transform the 1990 constant dollar decommissioning cost estimate to a future period. The Company's use of a 5.5% factor significantly alters the concept of employing a detailed site-specific decommissioning cost analysis to compute decommissioning costs. Effectively, by assuming a 5.5% factor, the Company has increased the "real" cost of its 1990 decommissioning study by about 100% by the time the decommissioning actually takes place. There is simply no evidence that the 1990 dollar, site specific decommissioning cost estimate will be two times as great by the time decommissioning actually takes place, not counting inflation. The proper approach would be to apply a general inflation factor....
Id. at 14 (footnote omitted). Mr. Baron further testified that the 5.5% escalation factor proposed by the Company essentially represents an additional contingency, on top of the 20% to 25% contingency already in the cost estimate, in the event that the decommissioning cost escalates at a rate greater than general inflation. Mr. Baron testified that an additional contingency is unnecessary, in part because if actual cost increases above general inflation occur in the future, they may be captured in future decommissioning studies that will be performed periodically. Id.
The Commission further relies upon a recent decision by a Federal Energy Regulatory Commission administrative law judge who rejected the Company's proposal to use a 5.5% escalation factor in estimating decommissioning costs for the Company's Grand Gulf nuclear unit. That ALJ adopted a 4% escalation rate based on the historic general inflation rate. System Energy Resources, Inc., 76 FERC ¶ 63,001 (1996) (noting that "SERI's 5.5 percent escalation factor is not supported by substantial evidence, and is not supported by Commission precedent"). Moreover, pursuant to a stipulation, Arkansas Power & Light, a subsidiary of Entergy, has been escalating decommissioning costs since 1988 using the CPIU as forecast by WEFA. Cross Exam. Mr. Volpi at 1025, L.P.S.C. (1/17/96). When questioned about the reasonableness of using the CPIU in Arkansas proceedings, Mr. Volpi responded as follows:
Q. Do you think use of CPIU is still reasonable, even though you believe it ought to be something higher?
A. I don't believe it's reasonable....
Q. But, to your knowledge, the company has no plans to seek a change of this stipulation at this time in Arkansas?
A. To my knowledge, I'm not aware of any current plans to seek a change to the stipulation....
*907 Id. at 1028. Similar to the Arkansas stipulation, the Commission reasons that the Proposal requires that O & M savings, which include decommissioning cost reductions, be calculated by factoring in the CPIU. The Commission also refutes the Company's claim that in a 1995 rate order, Order No. U-20925, the Commission applied a 5.5% escalation rate. In that order, the Commission stated:
Currently, the company estimates inflation and decommissioning cost increases of approximately 5.5%. Mr. Catlin suggest that rather than have the contributions grow at 5.5%, they should grow at the rate of inflation as measured by the CPIU which is approximately 3.6%. Utilizing this inflation gauge would cause current contributions to be somewhat higher and later contributions to be somewhat lower than they were when the Commission first adopted this proposal in 1990.
L.P.S.C. Order. No. U-20925 at 22. The rate order then provides that the appropriate annual decommissioning contributions are determined "[u]tilizing the company's projection of decommissioning costs ... [and] the CPI-U projection of inflation."[11]Id. at 24. Finally, the Commission asserts that the 1990 decommissioning estimate includes a significant contingency factor which safeguards against cost misestimates. Mr. Baron testified that the contingency factor in the 1990 decommissioning cost estimate is "designed to cover, at least in part, potential escalation greater than the general inflation rate in the decommissioning cost estimate." Dir. Test Mr. Baron at 16, L.P.S.C. (10/95). The Commission does not suggest that this safeguard alone is sufficient. Rather, the rate order emphasizes the use of periodic studies to provide more realistic and updated figures. L.P.S.C. Order No. U-21485 at 13.
We think the Commission properly resolved this issue. The Commission is not suggesting that the Company be denied any portion of the decommissioning cost to which it is eventually entitled. Rather the Commission has relied upon expert testimony and the decommissioning cost estimate provided by the Company to determine the estimated, future decommissioning cost, which is decidedly speculative. The Commission further indicates its willingness to review periodically future decommissioning cost estimates. On the other hand, the Company did not prove that not applying the 5.5% inflation rate was arbitrary or capricious. Rather, on cross-examination, Mr. Volpi's testimony on behalf of the Company suggests that the 5.5% factor may itself be inaccurate:
Q. So you don't recall any work papers or any calculations that developed the 5-and-a-half percent number?

A. I don't recall any work papers that developquotes, the "5-and-a-half percent" number. I believe what I have included in my exhibits to my testimony addresses the historical evidence that I have talked about and the projections for inflation. But there's, to my recollection, we don't have, quotes, "work papers" or analysis that says 5-and-a-half percent is the number.

. . .
Q. You do not know if any reliable information exists as to the actual escalation of decommissioning costs, as opposed to estimates. Is that right?

A. I'm not aware of any information that would indicate to us that the actual costs of decommissioning power plants such as River Bend.... I don't have any knowledge of that information being readily available.

. . .
Q. Well, you haven't looked at it in developing the 5.5 percent number?
A. I have not, no.
Cross Exam. Mr. Volpi at 1019-20, L.P.S.C. (1/17/96) (emphasis added). It is apparent that the Company's expert was not even able to support an escalation factor of 5.5%. Accordingly, *908 we hold that the Commission decision is supported by the record, and that the Commission did not act arbitrarily or capriciously, or abuse its discretion by escalating the cost according to the CPIU.

4. Accumulated Deferred Income Taxes
As its fourth assignment of error, the Company claims that the Commission wrongfully excluded from the Company's revenue requirement $10.184 million of accumulated deferred income taxes associated with net operating losses and alternative minimum tax carryforwards.
Typically, a utility collects revenues sufficient to pay all of its income taxes as a normal expense in the utility's revenue requirement. For tax purposes, but not for ratemaking purposes, the Internal Revenue Code permits the utility to accelerate and deduct depreciation on a new asset and thereby delay payment of part of the taxes until later years. For example, a new facility with a life span of twenty years, for tax purposes, may be depreciated over five years. Thus, the utility may retain as an expense substantial taxes that it will not pay in a given year by being allowed to deduct accelerated depreciation on the new asset. The resultant tax savings do not flow through to ratepayers, but rather are available for the utility to invest.[12]See generally Charles F. Phillips, Jr., The Regulation of Public Utilities Theory and Practice 283-87 (3d ed.1993). This benefit is recorded on the utility's books as a deferred tax credit and deducted from the utility's rate base because the utility is not entitled to a return on this cost-free capital. Thus, while a new facility increases rate base by the amount invested, accelerated tax depreciation reduces rate base by the amount of cost-free capital resulting from accelerated tax deductions.
If, however, the utility's accelerated tax deductions exceed its revenues, thereby creating a net operating loss ("NOL"), then the utility will not receive the benefit of the accelerated tax deductions to their full extent. The part of the deductions which exceed the utility's revenues will go unused. Essentially, NOLs represent tax deductions that did not in the given year produce cost-free capital. Nonetheless, NOLs may be recorded on the utility's books as deferred tax debits, and carried forward to future years when they can produce cost-free capital for the utility. Thus, NOLs are added to the rate base because they represent an asset, a future benefit.[13] The benefit will be realized in the form of reduced tax liability when the NOL carryforward is used to offset future taxable income on a subsequent tax return.
Over the years, the Company has carried forward substantial NOLs resulting from accelerated tax deductions. Specifically, the River Bend Phase-in Plan and plant additions during the period from 1986 to the time of this rate case all contributed to NOLs. In the instant rate order, the Commission allocated all of the NOLs to the deregulated portion of River Bend.[14] Thus, under the Commission's rate order, the NOLs do not increase the Company's rate base. The Company asserts, on the other hand, that the NOLs should be allocated pro rata between the regulated and deregulated portions of River Bend and thus increase the Company's revenue requirement by $7.8 million in this case.
Similar to NOLs, the alternative minimum tax ("AMT") may also prevent the use of certain tax deductions which may then be carried forward for use in a future tax year. The AMT postpones the full tax benefit of certain types of deductions (including accelerated depreciation) in tax years in which a taxpayer otherwise would pay less than a certain amount of minimum income tax. *909 Like NOLs, deductions not utilized because of the AMT increase rate base because they do not produce cost-free capital and because they are assets, or future benefits for the Company. According to the Company, the crux of the AMT issue is also whether the Commission properly allocated deductions not utilized because of the AMT between the deregulated and regulated portions of River Bend. As the Commission did with respect to NOLs, the Commission attributed all of the AMT carryforwards to the deregulated portion of River Bend. The Company asserts that this allocation method, rather than a pro rata allocation, unfairly reduces its revenue requirement by $2.35 million.
In the rate order following the first earnings review, the Commission excluded the AMT and NOL carryforwards from the Company's rate base. The Company appealed parts of the rate order, but did not raise as an assignment of error the Commission's treatment of the NOL and AMT carryforwards. See Gulf States Utils. Co., 676 So.2d 571. Nonetheless, the Company reraised the issue in the second earnings review, this case, by including the NOL and AMT carryforwards in its annual revenue-requirement filing. The Company asserts that the Commission's previous rate order following the first year earnings review does not have the effect of res judicata, and thus the Commission should consider the issue anew. Moreover, the Company asserts that because all of the Company's tax deductions are subtracted from all revenue to calculate the Company's net taxable income or loss, the Commission cannot possibly identify which tax deductions created the NOL and AMT carryforwards. Because the carryforwards cannot be specifically traced to either the deregulated or the regulated portion of River Bend, the Company argues, then a pro rata allocation is appropriate. The Company alternatively argues that even if the Commission properly attributed all of the NOLs to the deregulated portion of River Bend, then it follows that none of the deferred tax debits related to AMT may be attributed to the deregulated portion of River Bend. The Company reasons that if certain tax deductions were not going to produce current tax benefits because the deregulated portion of River Bend produced NOLs, then the AMT could not have deprived the Company of those same tax benefits a second time.
The Commission disagrees with the Company's contentions. In its rate order, the Commission stated that "[i]t is perfectly possible to ... examine the supporting figures to see which operations [regulated or deregulated] created the general entry," and that "Gulf States presented no statute, regulation, or court opinion that would preclude looking at the actual source of the NOL or AMT." L.P.S.C. Order No. U-21485 at 7-8. Additionally, the Commission observed that the Company did not raise the issue on appeal from the rate order following the first earnings review:
In Order U-19904-C the Commission determined that the deregulated portion of River Bend has not generated positive taxable income and that the regulated operations "have generated sufficient taxable income not only to overcome all tax deductible expenses attributable to the regulated portion of River Bend but also to reduce a portion of the tax losses attributable to the deregulated portion of River Bend." Since it was the losses attributable to the deregulated portion of River Bend that prevented the realization of the asset deferred taxes, the rate payers should not have to pay for the lost benefits. Rate payers especially should not have to pay a return on monies they have already paid the Company in advance for normalized taxes.
Id.
Although the Company couches the issue as whether NOL and AMT carryforwards were properly excluded from the Company's revenue requirement, we find that the broader issue is whether the Commission acted in an arbitrary or capricious manner in failing to reconsider its position in the first earnings review. See Gulf States Utils. Co., 676 So.2d at 578-79 (holding that the Commission was not "arbitrary and capricious in failing to reconsider its position on recognizing the accrual method of accounting for OPEBs" because, in part, the utility failed to present new arguments not presented in the previous *910 rate order, which the utility did not appeal). To permit a utility, based upon substantially the same evidence, circumstances and arguments, to relitigate in subsequent base rate proceedings the determinations of previous rate orders until the utility is satisfied with the result would allow the Company to prevail regardless of the merits by merely outlasting the Commission.
A review of Order No. U-19904-C, the order following the first earnings review, shows that the Commission extensively considered arguments and testimony substantially similar, if not identical, to those now presented by the Commission Staff and the Company in the instant case. In that previous order, the Commission relied upon the testimony of its consultant, Mr. Kollen, and found that it was possible to determine whether the deregulated or regulated portions caused the NOL and AMT carryforwards even though the Company did not file separate tax returns for each portion, and that, in fact, all of those carryforwards at issue were traceable to the deregulated portion of River Bend. L.P.S.C. Order U-19904-C at 23. The Commission noted that "Mr. Kollen's computations demonstrate that the deregulated disallowed portion of River Bend has never generated positive net taxable income. Thus, the net operating losses are only as low as they are because the positive net income of the regulated Gulf States." Id. For the same reasons, the Commission found that AMT carryforwards "are solely the result of the disallowed/deregulated River Bend adjustments." Id. at 21. In reaching these conclusions, the Commission rejected the testimony of the Company's expert, Mr. Warren, finding that Mr. Warren's testimony "does not undercut Mr. Kollen's findings." Id. at 24.
In the instant proceeding, the Commission again considered substantially the same testimony of Messrs. Kollen and Warren as presented in the first earnings review. In both proceedings, the Commission relied upon, and the Company attacked, a chart produced by Mr. Kollen calculating income and loss and tax effects for the deregulated portion of River Bend. The gist of the experts' recommendations and the parties' arguments has not changed in the instant proceeding.[15] Mr. Kollen continues to aver disallowance of the asset deferred taxes for the same reasons given in the earlier proceeding. Dir. Test. Mr. Kollen at 131, L.P.S.C. (12/19/95). Mr. Kollen testified that:
The tax NOLs were not created proportionately by the allowed/regulated and disallowed/deregulated portions of River Bend. The remaining tax NOLs were created disproportionately and totally by the disallowed/deregulated portions of River Bend.
The fact of the matter is that the disallowed/deregulated portion of River Bend has never generated positive taxable income.
Id.
In neither proceeding did Mr. Warren dispute the actual computations used by Mr. Kollen. Instead, Mr. Warren testified that, *911 "other than reviewing excerpts from GSU tax returns to which I refer, I have not checked or otherwise confirmed the numbers Mr. Kollen used." Cross Exam. Mr. Warren at 936, L.P.S.C. (1/17/96). Not only did the Company fail to adequately refute Mr. Kollen's numbers and calculations in both proceedings, the Company further failed, in both proceedings, to produce any calculations and numbers attempting to justify a pro rata allocation of the NOLs and AMT. The Company, instead, merely theorizes that the carryforwards should be allocated pro rata between the deregulated and regulated asset plans, arguing that causation is indeterminable because the Company does not file a tax return with respect to a single asset or group of assets owned by the Company. However, we know of no such authority precluding such a causation analysis, and the Company cites no authority other than the testimony of its own expert, whose view was confuted by Mr. Kollen's computations. Additionally, even the Company's expert testified that no Internal Revenue Service rules or regulations preclude such a causation analysis for ratemaking purposes. Cross Exam. Mr. Warren at 944, L.P.S.C. (1/17/96).
The Company further failed to adequately support its alternative argument that, even if the Commission properly attributed the NOLs to the deregulated portion of River Bend, then none of the AMT carryforwards may be attributed to the deregulated portion of River Bend. Mr. Kollen testified that the Company's conclusions are erroneous. The proper test, according to Mr. Kollen, is "whether the Company, in the absence of the disallowed/deregulated asset situation, would have an AltMin deferred tax asset in the test year based upon the cumulative payments of the AltMin tax in the test year and prior years." According to Mr. Kollen, "it is clear that the disallowed/deregulated asset mathematically would generate the AltMin tax." The Company's expert, on the other hand, provided no calculations to support his attack on Mr. Kollen's calculations and conclusion.
In brief and in oral argument, the Company's counsel noted the daunting complexity of this issue. We find that the Company has failed to present adequate evidence in the record to warrant this Court's overturning the Commission's order on this very complex area of tax/regulatory law. "The Commission is an expert within its own specialized field," Dixie Elec. Membership Corp., 441 So.2d at 1210, and "courts should be reluctant to substitute their views for those of the expert body charged with the legislative function of ratemaking," Gulf States Utils. Co., 676 So.2d 571. Mr. Kollen affirmatively reurges his findings from the first earnings review that the NOL and AMT carryforwards can be ascribed to the deregulated asset plan, and these carryforwards should not be included in rate base. Based on the record, which contains insufficient support for the Company's pro rata allocation and which has essentially been reviewed twice by the Commission, we find that the Commission did not act arbitrarily or capriciously by not reconsidering its previous ruling to exclude from rate base the NOL and AMT carryforwards discussed hereinabove based upon its determination that the carryforwards were caused by the deregulated portion of River Bend.

5. Short-Term Construction Work in Progress
The Company further asserts that the Commission erred by excluding from the rate base $29.519 million of construction work in progress ("CWIP"). The revenue requirement of the Company's request is $3.723 million. Under traditional, well-settled ratemaking policy, ratepayers are only required to pay a utility company a fair return on facilities and invested capital actually "used and useful" for production of service to the ratepayers. Gulf States Utils. Co. v. Louisiana Pub. Serv. Comm'n, 364 So.2d 1266, 1269 (La.1978). A facility or invested capital is used and useful if it is (1) in service, and (2) reasonably necessary. Central Louisiana Elec. Co., 508 So.2d at 1367 (citing City of Evansville v. Southern Ind. Gas & Elec. Co., 167 Ind.App. 472, 339 N.E.2d 562 (Ind. App. 2d Dist.1975)). By definition, investment in CWIP does not meet the first criterion because the construction is not complete and thus not in service. Id. Under the "used and useful" principle, this Court previously *912 addressed the exclusion of CWIP from rate base:
the utility has not usually been permitted in the past to include in its rate base, or to expense, the cost of construction work in progress ("CWIP"). (However, when the new construction is placed in service, the utility is entitled to earn a fair rate of return on and recover through depreciation (from then current ratepayers) all of its capital expenditures so incurred, including the cost of capital.)
Id. Although CWIP is not in service, Louisiana has recognized two methods which enable a utility to recover the cost of capital invested in CWIP. First, the Commission utilizes an allowance for funds used during construction ("AFUDC") approach:
Under this approach, the utility is allowed to include its CWIP expenditures in its rate base with an offsetting adjustment to its income. Although the rate base is increased by the CWIP expenditures, the utility's income is increased by the same amount thereby offsetting the effect of the increase in the rate base. Hence, these adjustments have no affect on the revenue required by the utility. Priest, Principles of Public Utility Regulation, Vol. 1, p. 179 (1969) (hereinafter "Priest"). "Thus, the inclusion of CWIP in the rate base is fictional, not actual. The net result is ... [that] when the plant goes into service, all costs, including interest, are reflected in the rate base in order that the investors may recoup their entire investment." 40 La.L.Rev. at 1051.
Id. In sum, the exclusion of CWIP from rate base accompanied by the accrual of AFUDC serves to defer recovery of the capital costs associated with CWIP; it does not deny the utility recovery of these costs. In the same case in which we recognized the AFUDC approach, we also stated that "[u]ltimately, the issue is one of regulatory choice of the Commission and not of the courts." Gulf States Utils. Co., 364 So.2d at 1271. In that case, we additionally noted that:
[a] substantial number, probably a majority, of regulatory commissions do not permit the utilities to recover from present consumers the present cost of construction work in progress ... which will be devoted to the use of future consumers. In a number of jurisdictions, the courts have upheld the actions of some of these regulatory commissions in completely excluding CWIP from the rate base.
Id.
Rather than blindly requiring the accrual of AFUDC to recover the cost of capital invested in CWIP, the Commission also has the discretion to include CWIP in the rate base if exigent financial circumstances warrant inclusion. The justification for controverting the "used and useful" rule is that utilities must be able to attract substantial capital to finance long-term construction projects. See L.P.S.C. Order U-14495. Additionally, the burden of obtaining capital at a reasonable cost is occasionally compounded by troubled or uncertain capital markets. Moreover, by including long-term, substantial CWIP in the rate base with an offsetting income adjustment, a utility's cashflow is disrupted. James W. Pierce, Jr., Note, Gulf States Utilities, The Public Service Commission, and The Supreme Court: On Raising the Electric Rates, 40 La. L.Rev. 1048, 1053 (1980). "Once complacently accepted when construction costs were low and the time required for construction short, AFUDC is today being questioned before regulatory agencies with increasing fervor as costs soar and the time necessary for new plant construction perennially increases." Id. For example, the Washington Utilities and Transportation Commission has noted that:
The advent of the energy shortage in this part of the country seriously threatened the financial integrity of electric utilities. Electric companies faced long-term commitments of capital for major construction projects without current earnings to support the debt resulting from such unavoidable commitments. Regulatory commissions understood that when they permitted partial allowance of CWIP to be included in rate base. Without the cash flow realized from including certain plant under construction in rate base, the capital required to build that plant could not be raised; therefore, certain CWIP was permitted *913 to earn a rate of return notwithstanding the fact that it was not then used and useful in providing service to ratepayers.
Washington Utils. & Transp. Comm'n v. General Tel. Co., Order No. U-80-38 (Wash. UTC 1981).
At issue in this assignment of error is whether, in the absence of exigent financial circumstances, the Commission acted arbitrarily or capriciously or abused its authority by excluding from the rate base "short-term" CWIP not accruing AFUDC. Short-term CWIP includes investments involving relatively small amounts of capital or relatively short construction periods. The Company contends that by excluding from the rate base short-term CWIP not eligible for AFUDC, it is being denied an opportunity to recover capital costs incurred during the period of construction.
In deciding to exclude the Company's short-term CWIP from rate base, the Commission reasoned that Gulf States' short-term CWIP has been excluded from rate base in the past, that the Company failed to cite any regulatory principle or case supporting inclusion of short-term CWIP not accruing AFUDC in rate base, and that no exigent circumstances were demonstrated to justify inclusion. L.P.S.C. Order No. U-21485 at 10. However, the Company contends that a showing of exigent circumstances is merely an alternative method of allowing the Company a return on its investment; it is not a factor when the Company cannot accrue AFUDC. Moreover, the Company argues that the Commission has previously included CWIP in rate base without any showing of exigent circumstances. See L.P.S.C. Order Nos. U-12977, U-13644, & U-14495-B. In fact, the Company observes, the Commission in a 1995 rate order included in rate base short-term CWIP not accruing AFUDC. See L.P.S.C. Order No. U-20925 at 4. Finally, according to the Company, "accounting rules do not permit the accrual of AFUDC on short-term CWIP; therefore, the only proper course of action is to include short-term CWIP in the rate base." Supplemental Post-hearing Brief on Behalf of Entergy Gulf States, Inc. of 11/2/98, at 18.
The Commission does not dispute that it permitted recovery of short-term CWIP not accruing AFUDC in a 1995 rate order involving Entergy Louisiana, Inc. Instead, the Commission counterargues that, beginning in 1988, the Commission has traditionally excluded all CWIP, including short-term CWIP, from Gulf States' rate base, and that "different practices have applied to the two companies for years." Id. Thus, the Commission contends the instant order is consistent with its previous orders. Moreover, the Commission argues that it does not prohibit the accrual of AFUDC on short-term CWIP, and that the Company offers no explanation of the "accounting rule" and its inescapable prohibition against accruing AFUDC on short-term CWIP. Post Hearing Reply Brief on Behalf of the La. Pub. Serv. Comm'n of 11/12/98, at 16. Citing the Company's own "Lead/Lag Summary," the Commission surmises that the reason the Company's accounting policy does not permit accrual is that short-term CWIP generally does not require financing because projects last thirty days or less, yet payment lag to vendors exceeds thirty days. The Commission observes that the Company's "accountants would have difficulty justifying an AFUDC accrual," and thus "there is no basis to require ratepayers to bear a nonexistent financing requirement." Id. at 16.
In New England Telephone & Telegraph Co. v. Public Utilities Commission, 448 A.2d 272, 293-94 (Maine 1982), the Supreme Court of Maine addressed the issue of whether a Commission must defer to the accounting practices of a utility for ratemaking purposes:
Generally speaking, the Commission is not bound by a utility's books of account in setting rates. 1978 NET Case, 390 A.2d at 23. However, if the Commission prescribes the method by which the utility must keep its books, the Commission may not disregard those books arbitrarily and without reason in the process of ratemaking. Id. In this case, we cannot find that the Commission acted arbitrarily in going beyond the prescribed method of accounting, as it did, in order to determine the rate base in accordance with its traditional *914 practice. Although 47 C.F.R. S 31.100:2, as incorporated in the Commission's regulations, may be read as requiring NET to carry short-term CWIP in rate base for accounting purposes, the Commission was justified in this case in not regarding that accounting treatment as creating an absolute substantive limitation on its determination of NET's rate base and test-year income statement.
If short-term CWIP were included in rate base without an AFUDC adjustment in NET's test-year income statement, the effect would be to authorize revenue on telephone plant not in service during the test year. Since the purpose of the test-year concept is to match revenues, expenses and rate base during a particular twelve-month period, the Commission is correct in deciding that inclusion of a short-term CWIP without an offsetting AFUDC adjustment would distort the test-year computations. The result would be that ratepayers would pay for construction work that yielded them no services during the test year. Before it comes on line, construction work in progress or telephone plant under construction is not "property... used in [the utility's] service to the public within the State." See 35 M.R.S.A. S 52....
That NET included short-term CWIP in a rate-base account pursuant to an accounting regulation is not dispositive .... [w]e cannot hold that the Commission [acted] arbitrarily or capriciously....
Id.; see Southwestern Bell Tel. Co. v. Pub. Serv. Comm'n Mo., 645 S.W.2d 44, 53-54 (Mo.App.1982) (upholding commission order excluding short-term CWIP from rate base even though FCC-ordered accounting rules required inclusion); see also Washington Utils. Transp. Comm'n v. General Tel. Co., Order No. U-80-38 (Wash. UTC 1981) (rejected utility's proposal to include short term CWIP in rate base because inclusion is unnecessary to maintain utility's financial integrity).
On this point, we agree with the Supreme Judicial Court of Maine. Ratepayers are not required to pay for facilities or capital investments that are not used and useful during the test year. The Company's proposal to include in the rate base short-term CWIP not accruing AFUDC plainly and unjustifiably circumvents this longstanding principle of ratemaking. Furthermore, the record is virtually devoid of any explanation of the "accounting rule" to which the Company adheres and which precludes the accrual of AFUDC; the Commission reasonably concludes that the Company's accounting policy does not permit accrual of AFUDC on short-term CWIP because short-term CWIP generally does not requiring financing due to payment lag. Additionally, we do not find improper the Commission's consideration of the financial integrity of a utility when determining whether to exclude from rate base short-term CWIP not accruing AFUDC.[16] Accordingly, regarding this assignment of error, we hold that the Commission did not act arbitrarily or capriciously or abuse its authority, and that the Commission's ruling is supported by the record.

6. Determination of GSU's Capital Structure
At issue in the sixth assignment of error is whether the gross proceeds or net proceeds of debt should be reflected in the Company's capital structure in order to determine a fair rate of return. A fair rate of return is computed using the "cost of capital" approach. South Central Bell Tele. Co., 594 So.2d at 362. Under this approach, the cost of capital equals "the annual percentage rate which a utility must receive to maintain its credit, to pay a return to the owners of the enterprise, and to insure the attraction of capital in amounts adequate to meet future needs." Id. "Mathematically, the cost of capital is the composite of the cost of the several *915 classes of capital used by a utilitydebt, preferred (and preference) stock and common stock (par value plus earned and capital surplus)weighted on the basis of an appropriate capital structure." Id. Thus, in order to determine a utility's average weighted cost of capital, the capital structure of the utility must first be determined. The capital structure consists of capital ratios that express, as a percentage, the portions of the utility's total capitalization consisting of debt capital and equity capital. In addition to determining the capital structure, the cost of each type of capital must be ascertained and then applied to the capitalization of a utility to find the average weighted cost of capital. Typically, the cost of equity capital is higher than the cost of debt capital, which is significant because the proportions of equity and debt are used to determine the average weighted cost of capital invested in rate base. In other words, the average weighted cost of capital changes as the ratio of equity capital to debt capital changes. A higher percentage of equity capital, which is more expensive than debt capital, translates into a higher average weighted cost of capital. Conversely, a higher percentage of debt capital, which is less expensive than equity capital, translates into a lower average weighted cost of capital.[17] "In applying the cost of capital standard, commissions face numerous and difficult problems `which almost defy solution.'" Phillips, supra, at 388 (footnote omitted) (quoting Joseph R. Rose, Cost of Capital' in Public Utility Rate Regulation, 43 Va. L.Rev. (1957)). Financial experts, lawyers and economists frequently disagree about the resolution of these problems. Paul J. Garfield & Wallace F. Lovejoy, Public Utility Economics 128 (1964).
The sole capital structure problem presented to this Court in this case is whether the Commission acted arbitrarily or capriciously by including the gross proceeds of debt, rather than the net proceeds of debt, in the Company's capital structure. The gross proceeds of debt is the amount of debt outstanding which the Company must repay. The net proceeds of debt is the amount of debt outstanding net of the unamortized balance of any discounts, premiums and issuance costs. These costs are recovered from the ratepayers in the computation of the effective cost rate associated with each of the outstanding issues of debt using the yield-tomaturity ("YTM") method. The YTM method is the conceptual framework used to compute the effective cost rate, i.e., the effective interest rate, of the Company's debt. Under this method, the difference between the "outstanding debt" and "net proceeds" of debt is recovered in the form of a higher interest rate than the simple coupon interest rate associated with each issue. This occurs in the YTM calculation by implicitly assuming that the Company is indebted for the issuance costs (the difference between the net proceeds and the outstanding balance) and undertakes a loan to cover the issuance costs at the time of the issuance. The loan is paid back in a mortgage type, levelized payment, amortized over the life of the issue.
In the instant case, the Company used the net proceeds of debt to determine the ratio of debt to equity capital in its capital structure.[18] The Commission, however, adjusted the Company's filing by reducing its average weighted cost of capital to reflect the gross proceeds of debt in the Company's *916 capital structure.[19] Consequently, the Company's Louisiana jurisdictional revenue requirement reported in its May 31, 1995 filing decreased by $1.349 million. The Commission and the Company do not disagree regarding the cost rates to be applied to the debt and equity elements of the capital structure, just whether gross proceeds or net proceeds of debt should be used.
In declining to adopt the Company's capital structure based upon the net proceeds of debt, the Commission reasons that gross proceeds of debt represents the Company's actual indebtedness, i.e., the amount of money recorded on the Company's books which it ultimately owes to its long-term bondholders. Moreover, the Commission argues that the use of net proceeds of debt is inappropriate because debt issuance costs have been accounted for in the effective cost rate associated with each of the outstanding issues of debt using the YTM method. The Commission further notes that Gulf States "consistently employed and the Commission recognized gross proceeds of debt."[20]L.P.S.C. Order No. U-21485 at 16. Ultimately, the Commission asserts that use of net proceeds in the Company's capital structure substitutes the more expensive equity capital for debt capital, which results in an over-recovery of the allowed return on equity capital.
The Company avers that net proceeds should be used to determine the Company's capital structure because that amount represents the actual capital the Company has available to invest in rate base. Thus, if the Company has a $1,000,000 debt issue with issuance costs of $50,000, the Company has only $950,000 to invest in rate base. At the time the debt is issued, the Company asserts, the implicit loan in the YTM method does not represent actual capital available for investment in rate base. Because issuance costs are amortized and collected over the life of the issue, the net proceeds available for investment in rate base will increase each year until the issue matures. Eventually, at the end of an issue's life, the gross proceeds of debt will be reflected in the capital structure because the Company will have paid, and recovered from ratepayers, the issuance costs. Ultimately, argues the Company, using gross proceeds in the capital structure, before the Company has recovered issuance costs, increases the percentage of the less expensive debt capital, which results in an under-recovery of the allowed return on equity capital.
Each side presented expert testimony on the issue. On behalf of the Commission Staff, Mr. Stephen J. Baron filed prepared direct and surrebuttal testimony advocating the use of gross proceeds in the Company's capital structure. Assuming that "the issuance expense has been borrowed at the cost of debt capital (implicit in the yield-to-maturity methodology) and is recovered in an amortized fashion similar to a mortgage, over the life of the bond," Mr. Baron concludes that the use of net proceeds of debt "produces an excess return on equity." Surrebuttal Test. Mr. Baron at 7, L.P.S.C. (12/11/95). Conversely, the use of gross proceeds of debt in the capital structure, as the Company has done in prior rate cases, "produces the correct result." Id.
On behalf of the Company, Mr. J. David Wright filed rebuttal testimony responding to the Mr. Baron's recommendation. Mr. Wright testified, as did Mr. Baron, that the Company in fact used the net proceeds of debt to determine its capital structure in its *917 filing for the 1993 test year during the first annual earnings review. Rebuttal Test Mr. Wright at 12, L.P.S.C. (11/13/95). Mr. Wright urges that the Commission again ascertain the Company's capital structure using the net proceeds of debt. Moreover, Mr. Wright testified that the use of gross proceeds of debt is "entirely inappropriate" for two reasons. First, it is the net proceeds which represent the amount of debt capital available for investment in rate base. The gross proceeds will eventually be reflected in the Company's capital structure but only at the end of an issue's life when the Company has recovered the issue costs. Second, the YTM method is based on net proceeds. The overall cost of capital is then applied to a rate base which has only net proceeds available to be invested. To then use gross proceeds in the capital structure to develop the overall rate of return would result in a mismatch, which would not allow the Company to recover its total debt cost and equity return. Id. at 13.
After reviewing the arguments propounded by the Commission and Company, we conclude that there is no compelling support for the positions of either party, as far as we can discern. On the one hand, the Company reasonably contends that debt capital should only include the net proceeds of debt, as that amount represents the actual amount of debt capital available to invest in rate base. On the other hand, the Commission's choosing the gross proceeds of debt, which are reflected on the Company's books, is equally persuasive. The net proceeds method advocated by the Company inflates the percentage of equity capital in the Company's capital structure, effectively converting the issuance costs of debt capital into equity capital earning a higher rate of return. The gross proceeds method advocated by the Commission, however, inflates the percentage of debt capital actually available to the Company for investment in rate base by treating the issuance costs of debt as if they were fictitiously available to invest in rate base.
In this very difficult situation, where each of the parties presents plausible arguments, it is important to bear in mind the constitutional scheme in which plenary ratemaking authority is delegated to the Commission, and the judiciary's limited role in reviewing the Commission's exercise of that authority. The Commission is authorized to fix just and reasonable rates for public utilities. In doing so, the jurisprudence in this state, and around the nation, has recognized the wide discretion accorded public service commissions as quasi-legislative bodies with constitutionally-derived powers. Courts should be hesitant to substitute their views for those of the expert body performing the legislative function of setting rates, and should not disturb the Commission's decision without a clear showing of abuse. "The right of commissions to consider [capital structure] in setting rates cannot be questioned, since a commission has an obligation to protect the consumer from excessive wages, excessive pension provisions, excessive prices for purchased materials and supplies, and other such things, including excessive costs of capital." Garfield & Lovejoy, supra, 130. In the instant case, the Commission has done no more than adopt the Company's actual capital structure using the actual amount of debt outstanding on the Company's books. Importantly, the Commission is not denying the Company recovery of the issuance costs. Instead, the YTM method allows the Company to collect the interest on the debt plus the issuance costs. Moreover, the Company has cited, and our independent research has revealed, no jurisprudence or treatise favoring the Company's approach. The Company simply has not demonstrated that the Commission has set unjust or unreasonable rates. Accordingly, based on the testimony and facts presented to this Court, we find that the Commission's adjustment utilizing the gross proceeds of debt in the Company's capital structure is neither arbitrary or capricious, nor an abuse of authority. The record supports the Commission's adjustment.

7. Correction of Errors
The Company asserts that the Commission erred by failing to include corrected calculations in the Company's revenue requirement. According to the Company, it inadvertently overstated the Company's base rate revenues by $1.156 million on a Louisiana retail basis in its original filing, thereby understating the Company's revenue requirement *918 by that amount. The Company also asserts that it inadvertently understated its base rate expenses by $1.052 million on Louisiana retail basis, thereby understating the Company's revenue requirement by that amount. The Company's assertions are based upon the testimony of Mr. Kenneth F. Gallagher, who stated that on a "total Company" basis, base rates should be increased by $2.153 million due to overstated base rate revenues and $1.196 million due to understated base rate expenses. Supp. Rebut. Test. Mr. Gallagher at 11, L.P.S.C. (11/13/95).
The Commission contends, however, that it was not bound to use the calculations supplied only a few weeks before hearings by Mr. Gallagher. He quantified the errors on a total company rather than Louisiana jurisdictional basis, and he provided insufficient supporting documentation containing conclusory entries rather than calculations.[21] In filed surrebuttal testimony, Mr. Kollen, the Commission's expert, responded to Mr. Gallagher's filed testimony, but declined to prepare his own calculations for four reasons:
First, this is a complex area which requires the involvement and interaction of all parties. Second, the Company would not provide a quantification as a starting point, despite some apparently unintentional realignments in its filing. Third, the Company has evidenced confusion in its realignments, now claiming "errors" in its filing that understate its base ratemaking revenue requirement. It is difficult to determine if there are errors or not. Fourth, not all relevant data is readily available in this proceeding.
Surrebuttal Test. Mr. Kollen at 22-23, L.P.S.C. (12/11/95). The Commission further observes that at the hearing, Mr. Gallagher only briefly mentioned the corrections on a total company basis, and again provided virtually no explanation of how they were derived.[22] At the conclusion of the hearings, counsel for the Commission asked for leave "to meet with GSU" to attempt to reach an agreement about the "costs that should be realigned and the effect of that on the revenue requirement." Tr. at 1177, L.P.S.C. (1/17/96). Because the parties could not agree on the scope of the meeting after the hearings, however, the meeting never occurred.
After reviewing the record, we find that it contains insufficient evidence to overturn the Commission's decision. Neither Mr. Gallagher's filed testimony nor his hearing testimony suggests the appropriate Louisiana jurisdictional revenue requirement. Moreover, the Company's last-minute assertion that its original filing was inaccurate is not fully supported. At the hearing and in filed testimony, Mr. Gallagher simply testified to the extent of the Company's errors on a total company basis, but did not provide supporting calculations. Accordingly, we cannot find that the Commission's decision was not based on the record, or that the Commission acted arbitrarily or capriciously or abused its discretion.

*919 8. Base Rate Refund

In the eighth assignment of error, the Company asserts that the Commission erred by requiring the Company to implement certain adjustments retroactively by refunding $9.635 million to its customers. This issue arises out of the terms of the Proposal appended to the Merger Order. According to the Proposal, the Company agreed to file with the Commission a "Louisiana jurisdictional revenue requirement" "within five months following the end of each of the first seven post-merger calendar years." L.P.S.C. Order U-19904, Appendix 1, at 4-5. The Proposal further provided that, "If the revenue requirement including the company's share of any savings, based on the most recently approved cost of equity, shows that reduction in rates is appropriate, the Company shall reflect that reduction in a Rider to be applied to bills rendered on and after the day following the filing." On the other hand, if the revenue requirement calls for an increase in rates,[23] the Commission is permitted 90 days to review the filing, unless the parties agree to or the Commission orders an extension of time. If the Commission fails to act within the 90 day period, however, the Company may increase the rates subject to a refund if the rates are later determined to be excessive. Id. According to the terms of the Proposal, this plan should "capture ratepayers' share of savings through a prompt and thorough regulatory review process." Id. at 1. Moreover, the Proposal provides that "[t]he Commission shall retain the right to review the accounting practices of the Company to ensure that they are consistent with GAAP and sound regulatory principles and practices." Id. at 6.
On May 31, 1995, the Company filed its Louisiana jurisdictional revenue requirement claiming a revenue deficiency of $30.774 million. Thus, according to the Company, the Proposal did not require it to implement an immediate rate reduction. According to the Commission, however, adjustments ordered in the rate order following the first earnings review, Order No. U-19904-C, should have been included by the Company in its rate filing in the second earnings review. The Company had excluded from its revenue requirement filing $24.879 million of adjustments required explicitly or implicitly, according to the Commission, by Order No. U-19904-C. Additionally, the Commission determined that the Company's filing included three new proposals, previously unapproved by the Commission, to change ratemaking treatment of certain costs. These new proposals constituted $15.53 million of the Company's claimed revenue deficiency.[24] The Commission contends that, if the Company's filing had complied with the first rate order and not included proposed new ratemaking treatments, the Company would have been required to implement a rate reduction of $9.635 million between June 1, 1995, the day after the filing was due, and May 31, 1996, the day that the third annual filing was due. The Commission asserts that by excluding previously ordered adjustments from its filing and including previously unapproved costs in its filing, the Company deviated from "GAAP and sound regulatory principles," and unilaterally inflated its cost of service, thereby permitting the Company to avoid a rate decrease the day after its annual filing. The Commission further contends that the Company's filing frustrated the intent of the Proposal, which was to promptly pass on savings to ratepayers.
The Company argues that the refund violates the rule against retroactive ratemaking. Second, the Company argues that it did not agree in the Proposal to implement voluntarily rate reductions based upon adjustments that the Commission adopted in the rate order following the first earnings review, especially when that rate order was pending on appeal at the time of the Company's second filing. Rather, the Company contends that it is entitled to advocate different resolutions to ratemaking issues so long as an appeal is *920 pending from the previous order, or the Company otherwise believes in good faith that new evidence or arguments may change the Commission's position. Third, the Company argues that it did not agree in the Proposal to forgo its right to reflect in its filing costs not previously approved by the Commission. Thus, according to the Company, the Proposal contemplated that where judgment is called for in the filing, it is the Company's judgment that is reflected.
We first address the Company's assertion that the refund violates the rule against retroactive ratemaking. In South Central Bell Telephone Company v. Louisiana Public Service Commission, 594 So.2d 357, 359-60 (La.1992), this Court provided a thorough description of the Commission's authority to order a refund. In that case, we stated:
[I]t is well established that the exercise by the Public Service Commission of its ratemaking authority is primarily a legislative function, which, in the absence of constitutional or statutory authority to the contrary, is limited to fixing rates to be applied prospectively. South Central Bell v. Louisiana Pub. Serv. Comm'n, 555 So.2d 1370 (La.1990); Louisiana Power & Light Co. v. Louisiana Pub. Serv. Comm'n, 523 So.2d 850 (La.1988); Public Utilities Comm'n of Ohio v. United Fuel Gas Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943); In re Petition of Minnesota Power & Light Co., 435 N.W.2d 550 (Minn.App. 1989); In re Petition of Elizabethtown Water Co., 107 N.J. 440, 527 A.2d 354 (1987).
This concept is inherent in our constitutional provisions which establish in general terms the powers of the Commission to "regulate all common carriers and public utilities and have such other regulatory authority as provided by law," but authorize the agency to require a utility to make refunds only when a provisional rate increase is disallowed or reduced before it becomes final. La. Const. Art. IV, Sec. 21(B). Similarly, the legislature has authorized the Commission to exercise regulatory power "for the purpose of fixing and regulating the rates charged or to be charged" by public utilities, La.R.S. 45:1163, but has recognized its power to order a refund in only one special situation, viz., when a temporary or provisional rate increase is disallowed, in whole or part, before its finality. La.R.S. 45:1163.1.
Generally, retroactive rate making occurs when a utility is permitted to recover an additional charge for past losses, or when a utility is required to refund revenues collected pursuant to its lawfully established rates. Louisiana Power & Light Co. v. Louisiana Pub. Serv. Comm'n, 523 So.2d 850 (La.1988); In re Petition of Elizabethtown Water Co., 107 N.J. 440, 527 A.2d 354 (1987); In re Central Vermont Pub. Serv. Corp., 144 Vt. 46, 473 A.2d 1155 (1984); Cheltenham & Abington Sewerage Co. v. Pennsylvania Pub. Util. Comm'n, 344 Pa. 366, 25 A.2d 334 (1942); Chesapeake and Potomac Tel. Co. of West Virginia v. Public Serv. Comm'n of West Virginia, 171 W.Va. 494, 300 S.E.2d 607 (1982); State ex rel. Utilities Comm'n v. Edmisten, 291 N.C. 451, 232 S.E.2d 184 (1977). A commission-made rate furnishes the applicable law for the utility and its customers until a change is made by the Commission. Michigan Bell Tel. Co. v. Michigan Pub. Serv. Comm'n, 315 Mich. 533, 24 N.W.2d 200 (1946). Therefore, the utility is entitled to rely on a final rate order until a new rate in lieu thereof is fixed by the Commission. Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932); Michigan Bell Tel. Co. v. Michigan Pub. Serv. Comm'n, 315 Mich. 533, 24 N.W.2d 200 (1946). Consequently, the revenues collected under the lawfully imposed rates become the property of the utility and cannot rightfully be made the subject of a refund. Michigan Bell Tel. Co. v. Michigan Pub. Serv. Comm'n, 315 Mich. 533, 24 N.W.2d 200 (1946).
A utility is entitled only to the opportunity to earn a reasonable return on its investment; the law does not insure that it will in fact earn the particular rate of return authorized by the Commission or indeed that it will earn any net revenues. Southern California Edison Co. v. Public Utilities Comm'n, 20 Cal.3d 813, 144 Cal. *921 Rptr. 905, n. 8, 576 P.2d 945, n. 8 (1978) citing Federal Power Comm'n v. Natural Gas Pipeline Co., 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942); Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n, 262 U.S. 679, 692-693, 43 S.Ct. 675, 678-679, 67 L.Ed. 1176; Re General Tel. Co. of Cal., 69 Cal.P.U.C. 601, 610 (1969); Oakland v. Key System Transit Lines, 52 Cal.P.U.C. 779, 786 (1953). By the same token, if the utility's profits turn out to be higher than had been forecast by the Commission in setting the rates, the law does not penalize the Company for its efficiency by requiring a divestiture of unanticipated earnings. In re Petition of Elizabethtown Water Co., 107 N.J. 440, 527 A.2d 354 (1987); Connecticut Light & Power Co. v. Department of Pub. Util. Control, 40 Conn.Supp. 520, 516 A.2d 888, 897 (1986); B & O R. Co. v. Pennsylvania Public Utility Commission, 136 Pa.Super. 517, 7 A.2d 488, 491 (1939). The Commission's recourse is to fix a new rate prospectively and not to change the rates retroactively. In re Petition of Elizabethtown Water Co., 107 N.J. 440, 527 A.2d 354 (1987).
Id.
Applying the foregoing rules, we concluded in South Central Bell that a Commission-ordered refund violated the rule against retroactive ratemaking by depriving the utility after the fact of funds earned under rates valid at the time. In that case, the Commission issued an order placing the utility on notice that the Commission was beginning an investigation to determine whether the utility's earnings were excessive. According to the order, the utility could maintain its current rate schedule, but would be required to refund any excessive rates collected after the date of the order. Following an investigation, the Commission ordered a prospective rate decrease, and ordered the utility to refund approximately $35 million, the amount collected during the pendency of the investigation in excess of the new rates. Id. at 358-59.
In overruling the refund, we determined that the basis for the Commission's refund order was the Commission's finding that the utility's revenues were excessive during the investigative period. Significantly, we found that the utility never collected improper rates. We further noted that the interim order authorizing the investigation stated clearly and unambiguously that the order did not change the present status of the utility's rates or revenues. Thus, we reasoned that "the refund order was clearly an act of retroactive rate making because it divested the company of earnings it had properly derived from then lawful rates fixed by a final order of the Commission."
The case sub judice is quite dissimilar from South Central Bell. To begin, it arises out of the peculiar circumstances surrounding the merger of Entergy and Gulf States. Only after the parties, including the Commission Staff, stipulated to the Proposal did the Commission approve the merger, determining that it was in the public interest. The Proposal outlines an annual earnings review procedure to ensure that merger savings are promptly passed on to ratepayers. Part of that procedure requires the Company to implement rate changes based upon its filing of a Louisiana jurisdictional revenue requirement that complies with sound regulatory principles and practices. The Company bargained for this outcome. In South Central Bell, on the other hand, the utility never agreed to implement rate reductions absent a final rate order.
Collection by the Company of rates greater than those authorized by the Merger Order and Proposal amounts to collection of improper rates. In South Central Bell, however, the utility was ordered to refund lawful, unchanged rates that were supposed to prevail until a successive rate order. The Commission initiated an investigation, determined that those rates were excessive, and consequently ordered a refund of the excessive rates collected following the commencement of the investigation. As this Court unanimously found, that was unquestionably retroactive ratemaking. Reading the Commission's instant refund order, however, it is evident that the instant refund is not premised on the Commission's finding that the Company's revenues were excessive between June 1, 1994 and May 31, 1995. Rather, the *922 Commission ordered the refund because the Company collected not rates to which it was entitled, but amounts in excess of those rates, i.e. improper rates. Specifically, the Commission stated:
Such a refund does not constitute retroactive ratemaking. As of June 1, 1995 the only rate that Gulf States Utilities Company, Inc. was authorized to charge its customers was a rate that had been adjusted to reflect savings realized under the merger plan.
L.P.S.C. Order No. U-21485 at 18. We agree. The refund order does not violate the rule against retroactive ratemaking when the retroactive adjustments simply correct the Company's filing by bringing it into compliance with GAAP, sound regulatory principles and practices, and the Proposal and Merger Order's command to promptly pass on savings to ratepayers.[25] By this standard, we address below each of the retroactive adjustments.

A. Retroactive Adjustments Based Upon Order No. U-19904-C
The Commission imposed six retroactive adjustments, totaling $24.879 million, to the Company's revenue requirement filing to bring the filing into compliance with Order No. U-19904-C, the rate order following the first earnings review. The Company appeals the retroactive application of three of these adjustments and a purported fourth adjustment.[26]
The first involves the retroactive adjustment removing accumulated deferred income taxes from rate base. In U-19904-C, the Commission adjusted the Company's filing to exclude these taxes from rate base. The Company did not appeal that adjustment. In the Company's May 31, 1994 filing, the Company again added to its rate base accumulated deferred income taxes associated with NOLs and AMT. For the second time, the Commission excluded these taxes from rate base, which decision we affirm in our resolution of the fourth assignment of error hereinabove.[27] In our discussion of the fourth assignment of error, we recognized that the Company is at liberty to relitigate this issue, but that it failed to present new supportive arguments and evidence. Nonetheless, ratepayers should not be deprived of their share of the merger savings simply because the Company chose to relitigate the issue, and did so unsuccessfully. The Commission's previous adjustment in Order U-19904-C, which the Company did not appeal, and our decision in the fourth assignment of error affirming the adjustment in the instant case demonstrates that the Company's filing deviated from sound regulatory principles and practices. Moreover, the explicit intention of the parties when they agreed to the Proposal was to pass on savings to customers expeditiously, in fact, immediately following the Company's May 31 filing. By excluding this adjustment from its filing, the Company controverted both of these intentions. The Company not only delayed passing on savings *923 to ratepayers, but also attempted to avoid passing them on at all. Accordingly, we find that retroactive application of this adjustment comports with the terms of the Proposal, and does not violate the rule against retroactive ratemaking.
We further uphold the Commission's retroactive adjustment excluding $.055 million of ad valorem taxes on certain Plant Held for Future Use ("PHFU"). In the order following the first annual earnings review, Order No. U-19904-C, the Commission ordered that PHFU not be included in rate base. The Company did not appeal that adjustment. In the Company's second annual filing, however, the Company included ad valorem taxes on PHFU. The Company does not appeal the prospective adjustment excluding the taxes from its rate base, but it does contest the retroactive application of the adjustment to June 1, 1995. In our view, it follows from the Commission's previous exclusion of PHFU from rate base that the taxes on PHFU are also unrelated to regulated operations and thus should also be excluded from rate base. Therefore, the Company's May 31, 1995 filing violated sound regulatory principles and practices. Moreover, the filing defeated the purpose of the Proposal by delaying the realization of savings for ratepayers. Accordingly, we find that retroactive application of this adjustment comports with the terms of the Proposal, and does not violate the rule against retroactive ratemaking.
The Company contends also that the Commission's adjustment in this case removing $3.643 million of revenue annualization from rate base was not justified by the previous rate order because the adjustment was vacated by this Court on appeal. We agree with the Company on this point. The revenue annualization adjustment reflects an annualization of the effect of an increase in the number of customers at the end of the test year. Following the first earnings review, the Commission ordered and the Company appealed the revenue annualization adjustment. In Gulf States Utils. Co., 676 So.2d at 582, we found that the Commission acted arbitrarily and capriciously by adopting the revenue annualization adjustment with such short notice to the Company and without corresponding rate base and expense adjustments. Because the Company's appeal of that adjustment was pending at the time of the Company's May 31, 1995 filing, and because that Commission adjustment was eventually vacated by this Court, we find that the Commission's retroactive application of this adjustment by relying on U-19904-C for precedent is arbitrary and capricious and not supported by the Merger Order or Proposal. Because the Commission has failed to prove that this adjustment violated the terms of the Merger Order or Proposal, this retroactive adjustment does violate the rule against retroactive ratemaking.
The Company further takes issue with the Commission's purported retroactive application of a rate base annualization adjustment. According to the Company, the Commission rejected this adjustment in the first earnings review because it was belatedly proposed by the Commission Staff. The Commission avers, though, that this adjustment was not made retroactive and thus is not included in the refund calculation. The Company submitted no calculations proving otherwise. Also, the Commission's computation of the refund indicates that the refund is based solely on adjustments ordered during the first earnings review. Accordingly, we find the Company's argument on this adjustment is without merit.

B. Retroactive Adjustments Based Upon New Company Proposals
In addition to the above adjustments premised on Order No. U-19904-C, the Commission ordered that three new Company proposals totaling $15.53 million be excluded retroactively from the Company's May 31, 1995 filing. In the rate order sub judice, the Commission retroactively adjusted the Company's filing by excluding $7.486 million in depreciation expense. The Company had updated its depreciation expense by filing a new depreciation study. Because the Commission did not have adequate time to review the study, and because the Commission thought it would be appropriate to defer an increase in depreciation rates until the end of the River Bend phase-in plan, the Commission deferred consideration of the *924 Company's request. L.P.S.C. Order No. U-21485 at 11-12. The Company does not challenge the Commission's deferral, but rather argues that the Company had a right to include in its filing updated depreciation expense, and thus the Commission unjustifiably disallowed this adjustment retroactively. The Commission's order further requires the Company to remove retroactively from its filing a $4.321 million increase in nuclear decommissioning expense. Similar to depreciation expense, the Company argues that decommissioning expense should be reflected on a current basis in the Company's filing. In ordering that these two adjustments be made retroactive to the date of filing, the Commission reasoned that the Company "should not be free to unilaterally inflate its cost of service study by deciding to include significant changes to major categories such as depreciation and decommissioning expense." Id. at 18. To prevent this, the Commission concluded that "if such are to be considered under the annual revenue requirement review, arrangements should be made so that review of such matters is completed prior to their inclusion in an annual review." Id.
We find the Commission's retroactive adjustment of decommissioning and depreciation expenses reasonable and supported by the Proposal, and agree with the Commission's order that the Company should submit decommissioning and depreciation studies well in advance of filing so that a review can be completed by the Commission staff prior to the May 31 filing date. The Proposal provides that "[t]he Company shall provide data to the Commission's consultants and special counsel (or Staff, if the Commission so designates) prior to the filing, as it becomes available." L.P.S.C. Order No. U-19904, Appendix 1, at 2 (emphasis added). Thus, the Proposal imposes an affirmative duty on the Company to supply data in advance of its May 31 filing if the data is available. The Company has presented no evidence to this Court suggesting that the decommissioning and depreciation data was not available until May 31, 1995. The Company's delay in studying and analyzing that data should not enable the Company to delay or avoid rate reductions, especially when the annual reviews set forth in the Proposal are intended to promptly pass on savings to ratepayers. Accordingly, we find that retroactive application of this adjustment comports with the terms of the Proposal, and does not violate the rule against retroactive ratemaking for reasons already stated.
The Commission also retroactively adjusted the Company's filing to exclude CWIP not accruing AFUDC, adding $3.723 million to the ordered refund.[28] According to the Company's own brief to the district court, exclusion of CWIP not accruing AFUDC "is consistent with the Commission's traditional policy regarding this issue, because during the [R]iver Bend phase in period, the Company has not requested the inclusion of short-term CWIP in ratebase." Brief on the Merits on Behalf of Entergy Gulf States, Inc., at 110 (4/16/97) (emphasis added). In fact, the Company in the previous ten years had never been authorized to include CWIP in its rate base. Nonetheless, the Company asserts that the Proposal does not preclude such an adjustment, and that it is consistent with sound ratemaking principles and practices.[29] In our view, however, the exclusion of CWIP not accruing AFUDC is consistent with the Commission's traditional policy, which the Company has not appealed, and thus is consistent with sound ratemaking *925 policies and practices. Accordingly, we find that retroactive application of this adjustment comports with the terms of the Proposal, and does not violate the rule against retroactive ratemaking.
We recognize that rate orders are generally not res judicata, see generally Gulf States Utilities Co. v. Louisiana Pub. Serv. Comm'n, No. 92-1185 (La.3/17/94), 633 So.2d 1258, 1267-68 (Dennis, J. concurring), and that a utility has a right to propose new ratemaking treatment of certain costs. In order for the Company to advocate new treatments or reraise issues to obtain treatments different from those in previous rate orders, the Company may need to reflect those treatments in its May 31 filings. Otherwise, the Company may waive its right to litigate or appeal the issue. Nonetheless, when the Commission later determines that the Company's filing did not comply with GAAP or sound regulatory practices and procedures, or that the Company intended to inflate its cost of service to avoid a rate decrease, the Commission is within its constitutional and legislative power to order a refund to bring the filing into compliance with the Merger Order and Proposal. The refund effectively returns to customers rates which the Commission later determined to be unlawfully collected rates. If the Company could include any new cost in its filing that it deemed reasonable in an attempt to reverse the Commission's regulatory policies and practices and avoid the terms of the Merger Order and Proposal, it could delay rate decreases based solely on its own judgment. Such an approach is unfair to ratepayers and frustrates the purpose of the Merger Order and Proposal. Accordingly, the refund is affirmed in full except for the $3.643 million related to the retroactive revenue annualization adjustment. The Company is ordered to implement the remaining portion of the refund without delay.

9. Exclusion of Evidence
On appeal to the district court, the Company filed a motion to introduce additional evidence regarding two adjustments made by the Commission, one to disallow 1994 O & M expenses addressed in the first assignment of error, supra, and another to reflect the gross proceeds of debt (as opposed to the net proceeds) in the Company's capital structure addressed in the sixth assignment of error, supra. The district court denied the Company's motion, and we denied the Company's subsequent supervisory writ application asking us to direct the district court to admit the additional evidence. Gulf States Utils. Co. v. Louisiana Pub. Serv. Comm'n, No. 97-1084 (La.6/20/97), 695 So.2d 1353. The Company now reurges the issue in its direct appeal to this Court. Specifically, in its final assignment of error, the Company contends that the district court erred by denying the Company's motion to admit additional evidence pursuant to La.R.S. 45:1194. That statute provides that:
If, upon the trial of any suit brought to contest any decision, act, rule, rate, charge, classification, or order, of the commission, the plaintiff introduces evidence which is found to be different from that offered upon the hearing before the commission, or additional thereto, the court, before proceeding to render judgment, unless the parties to such action stipulate in writing to the contrary, shall send a transcript of such evidence to the commission, and stay proceedings in the suit for fifteen days from the date of such transmission. Upon the receipt of the transcript, the commission shall consider the evidence, and it may alter, modify, amend, or rescind its decision, act, rule, rate, charge, classification, or order, complained of in the suit and shall report its action to the court within fifteen days from the receipt of the transcript.
Because we find hereinabove that the Commission acted arbitrarily and capriciously by disallowing entirely the 1994 O & M expenses, the issue of whether the district court erred by excluding additional evidence on that assignment of error is moot. Nonetheless, we must determine whether the district court properly excluded additional evidence regarding the Company's capital structure. The Company asserts that the additional evidence, consisting of prepared testimony by Mr. Bruce M. Louiselle, provides a mathematical demonstration that the *926 net proceeds method produces the correct ratemaking result, while the gross proceeds method results in underrecovery of the Company's capital costs. The Company further contends that this evidence is relevant and admissible. The Commission, on the other hand, argues that the additional evidence is cumulative because it merely reexplains the Company's position asserted during hearings before the ALJ. The Commission believes that the Company's dissatisfaction with its hearing presentation is no good reason for recommencing the hearing process.
This Court first discussed La.R.S. 45:1194 in detail in White v. Louisiana Public Service Commission, 259 La. 363, 250 So.2d 368 (1971). In White, this Court held that the district court acted contrary to the statute when it admitted into evidence, and considered on its own, depositions of a number of witnesses that had not been considered by the Commission before issuing its ruling. The Court reasoned that:
Ordinarily, review of administrative rulings does not even allow the trial court or this court to make independent findings of fact where there are findings of fact in the record, unless there is a showing that the findings of fact were arbitrary and unreasonable and made without substantial evidence. Moreover, new facts are not ordinarily received by courts for an independent determination on purely administrative adjudications....
Administrative boards such as the Public Service Commission are the primary fact-finders. Many jurisdictions have adopted the `substantial evidence rule' for limiting the scope of judicial review. Only in exceptional cases is new evidence admissible in a trial court on review of an adjudication made after a hearing before an administrative board. It is a non-judicial function to fix rates, issue licenses, and [259 La. 375] grant certificates of authority. Where the Legislature has regulated business and activities, it has assigned these duties to administrative boards and agencies. Moreover, it would unduly burden the courts to require them to function in a purely legislative or executive capacity. Indeed, our restraint in acting only as a judicial reviewing body maintains the essential separation of powers in this field. See 2 Cooper, State Administrative Law, Chapt. XIX (1965); 4 Davis, Administrative Law Treatise, Chapt. 29 (1958).
The trial court acted contrary to statute and the Constitution in permitting the introduction of new evidence without requiring an explicit stipulation of all parties, particularly the Commission, that the new evidence would not have to be resubmitted to the Commission before the trial court could adjudicate the issue.
Id. at 372 (emphasis added). The Commission argued to the district court that White stands for the proposition that new evidence should be admitted in an appeal of a Commission decision to a district court only in exceptional cases. The Commission's interpretation of White misses the mark, however, by taking the "exceptional circumstances" language out of context. White stands for the more narrow rule that, absent exceptional circumstances, the district court may not consider additional admitted evidence without first submitting a transcript of the evidence to the Commission, unless the parties stipulate otherwise. These are not the facts of the instant case, as the district court judge here refused to consider the additional evidence proffered by the Company. White does not address the district court's refusal to admit evidence.
Two years after White was handed down, this Court decided Red Ball Motor Freight v. Louisiana Public Service Commission, 286 So.2d 337 (La.1973), which also discusses in detail La.R.S. 45:1194. In Red Ball, the Commission ordered a common carrier to show cause why it should not be found guilty of failing to adequately perform motor transportation service. Upon rehearing, the Commission affirmed its original order mandating that the common carrier reestablish a terminal facility in Leesville, Louisiana. The common carrier appealed the order to the district court, and attempted to introduce additional evidence regarding the cost of operating the terminal. Testimony adduced at the Commission hearings had consisted primarily of complaints about the discontinuance of service at the Leesville terminal. *927 "Other than statements of a general character," no evidence at the hearings addressed the cost of maintaining the terminal. Nonetheless, the district court judge refused to admit the new evidence.
Relying upon La.R.S. 45:1194, this Court overruled the district court. We stated that:
As we view the statute, the evidence a plaintiff tenders for introduction in a suit to review a Commission order is necessarily governed by the rules of evidence concerning admissibility. However, when the evidence meets the test of admissibility, the trial judge must permit it to be introduced into the record. Thereupon, if the evidence is found to be different from that offered upon the hearing before the commission, or additional thereto, the court, before proceeding to render judgment ... shall send a transcript of such evidence to the "commission." The language [of the statute] is mandatory. The trial judge has no discretion in the matter.
Id. at 339 (emphasis added). We further observed that:
The objection that it is new evidence which will result in a "duplicity of trials" is answered by the language of the enabling statute making it abundantly clear that the law contemplates introduction, in a proper case, of evidence which is "different" or "additional" to that offered before the Commission.
Id. at 340. Because the proffered cost study was relevant and otherwise admissible under the rules of evidence, the district court was required to admit the proffered evidence, and send a transcript of such evidence to the Commission. Id. at 340-41.
La.R.S. 45:1194 was most recently discussed in Matlack, Inc. v. Louisiana Public Service Commission, No. 93-0277 (La.5/24/93), 622 So.2d 640, which opinion creates some confusion regarding the standard to be applied when a plaintiff offers additional evidence in an appeal from a Commission order. In Matlack, a motor carrier on appeal to the district court sought to introduce new evidence of its six-year operating history following the hearings before the Commission. In upholding the exclusion of the evidence, the Court determined that La. R.S. 45:1194 was "inapplicable" because the proffered evidence was not necessary to decide the case, as the Commission decides cases on facts as they exist at the time of hearing, and not based upon post-hearing evidence. Although the Court determined La.R.S. 45:1194 was inapplicable, we made the following observation:
We recognized in Red Ball that LSA-R.S. 45:1194 permits the court in a "proper case" to remand for the purpose of taking additional evidence. Yet, we noted in White that such new evidence should be permitted in "exceptional cases." We find that this is not such a case.
Id. (citations omitted). Thus, Matlack cites the incomplete rule from Red Ball and contradistinguishes it against the incorrect interpretation of White. However, as we have described hereinabove, White and Red Ball do not conflict. The rule of Red Ball is that, when the evidence meets the test of admissibility, the trial judge must permit it to be introduced into the record. White stands for the more narrow rule that, absent exceptional circumstances, the district court may not consider additional admitted evidence without first submitting a transcript of the evidence to the Commission, unless the parties stipulate otherwise. To the extent our holding in Matlack conflicts with these interpretations of White and Red Ball, Matlack is overruled.
We find the rule of Red Ball controlling in the instant case. When the evidence meets the test of admissibility, the trial judge must permit it to be introduced into the record. Under the Louisiana Code of Evidence, relevant evidence "may be excluded if its probative value is substantially outweighed by ... considerations of undue delay, or waste of time." La.C.E. art. 403. Article 403 requires a weighing and balancing of the probative value of the evidence against the "legitimate considerations of judicial administration enumerated in that article." State v. Mosby, 595 So.2d 1135 (La. 1992). Undue delay and waste of time "apply where the evidence relates to the event in question but is `overkill.'" Frank L. Maraist, Louisiana Civil Law Treatise Evidence & Proof § 5.1, at 68 (1999). Additionally, *928 article 403 generally follows Federal Rule of Evidence 403. That rule permits a judge undertaking the article 403 balancing test to exclude the testimony of additional witnesses as cumulative. Although Louisiana's version of article 403 excludes the "cumulative" language, "the result should be the same, because the evidence would be a `waste of time.'" Id. Moreover, in the instance of a direct appeal of a Louisiana Public Service Commission order, the district court, when performing the article 403 balancing test, should consider in its weighing of these factors the reason for a party's failure to admit the proffered evidence during the Commission hearings, where the legislature intended the factfinding to occur. Under this analysis, the probative value of relevant evidence may well be substantially outweighed by considerations of undue delay, or waste of time. This rule is especially necessary to prevent further delays in the implementation of rate decrease orders.[30] In all such cases, however, the district court judge has great discretion in determining the relevancy and probative value of evidence, and "his determinations regarding relevancy and admissibility should not be overturned absent a clear abuse of discretion." Mosby, 595 So.2d at 1139; see Stockstill v. C.F. Indus., Inc., 665 So.2d 802 (La.App. 1st Cir.1995); Hebert v. Angelle, 600 So.2d 832, 836 (La.App. 3d Cir.), writ denied, 604 So.2d 997 (La.1992); Maraist, supra, § 5.2 n. 31.
After hearing arguments on the admissibility of the Company's proffered evidence, the district court judge ruled as follows:
The court is of the opinion, that the Commission had before it sufficient evidence at that juncture to make a decision. Whether the evidence is espoused by one witness versus another essentially is of little moment. This court is of the opinion that [this] is an application for judicial, review.... This will not be a trial de novo. Therefore, the motion to expand the introduction of new evidence at [the] appellate level is hereby denied.
Motion Hearing Tr. of 4/18/97. Although the district court did not expressly rely upon article 403, we find the district court effectively undertook the article 403 balancing test, finding that the probative value of the evidence was substantially outweighed by considerations of undue delay and waste of time. After reviewing the record, including the proffered evidence, we cannot find that the district court abused its discretion. The Company was appealing a rate order issued pursuant to the Merger Order and Proposal, the intent of which is to promptly pass on savings to ratepayers. The Company's dissatisfaction with its hearing presentation is no basis to recommence the hearing process, further delaying implementation of the rate order, especially when the proffered testimony is simply a reiteration of the position taken by its witness who did testify before the Commission. The Company sought to introduce the prepared testimony of Mr. Bruce M. Louiselle to provide a mathematical demonstration that the net proceeds method produces the correct ratemaking result, while the gross proceeds method results in underrecovery of the Company's capital costs. At the motion hearing before the district court, counsel for the Company admitted that the Company wanted to introduce the additional testimony "in an effort to better explain" this issue "although it's relatively straight forward." Moreover, counsel acknowledged that, at the time of the Commission hearings, "the evidence was theoretically available to [the Company], and that [the Company] could have developed it or gone and found it." The Company likens the additional testimony to the cost study proffered in Red Ball, which evidence this Court ordered the district court to admit. However, in Red Ball, "other than statements of a general character," no evidence at the hearings addressed the cost of maintaining the terminal at issue. In the instant case, the Company presented the testimony of its expert, Mr. Wright. Mr. Wright reached the same conclusions for virtually the same reasons offered by Mr. Louiselle. For the foregoing reasons, we do not *929 find that the decision of the district court excluding the Company's proffered testimony on the proper capital structure was a clear abuse of discretion.[31]

DECREE
For the reasons assigned, we reverse that part of the prospective rate order reducing the Company's Louisiana jurisdictional revenue requirement by $6.116 million by disallowing 1994 O & M expenses incurred to produce savings, and remand the case to the Commission for a determination of the amortization period appropriate for the Company to recover these expenses. Thus, the Company's contention that the district court erred by refusing to admit evidence regarding this adjustment is moot. We further reverse the refund portion of the rate order to the extent it included $3.643 million related to the revenue annualization adjustment. Otherwise, the Company is ordered to implement the remaining amount of the refund without further delay. In all other respects, Order No. U-21485 is affirmed. Additionally, the district court's ruling excluding additional evidence regarding the Company's capital structure is affirmed.
REVERSED IN PART AND REMANDED.
LEMMON, J., dissents in part and assigns reasons.
LEMMON, J., Dissenting in Part.
With regard to Assignment of Error No. 9, the majority essentially rules that the trial judge's exclusion of evidence, which was arguably admissible and referable back to the Commission under La.Rev.Stat. 45:1194, was right for the wrong reasons. I have difficulty in according deference to a discretionary ruling of the trial judge when the ruling was not based on the exercise of discretion, but on an erroneous application of law.
The evidence offered in the trial court was admissible under the rules of evidence unless the judge based a ruling on La.Code Evid. art. 403, which involves the exercise of discretion. The judge did not exclude the evidence on the basis of Article 403, but on the basis that the Commission had sufficient evidence before it to make a decision. In my view, the judge, under La.Rev.Stat. 45:1194, should have admitted the evidence and sent the transcript of the evidence to the Commission before rendering judgment.[1]
The exclusion of this evidence is particularly significant in light of the fact that this court is also ruling, under Assignment of Error No. 6, that there is no compelling support for the positions of either party. The excluded evidence may well have swung the balance in favor of the Company and should have been admitted.
NOTES
[*] Traylor, J., not on panel. Rule IV, Part 2, § 3.
[1] As a condition to the Commission's approval of the merger, Entergy stipulated that it will not recover the acquisition premium from Louisiana ratepayers.
[2] Traditionally, O & M savings are not recoverable operating expenses. Here, the Company proposed that the savings be included as operating expenses as a means of recovering indirectly the premium the Company paid for Gulf States.
[3] The Commission, after reviewing the initial post-merger filing, ordered a rate reduction. That order was affirmed in part and reversed in part on appeal to this Court. Gulf States Utils. v. Louisiana Pub. Serv. Comm'n, No. 96-0345 (La.7/2/96); 676 So.2d 571.
[4] Although the Company argues that its actual revenues were insufficient to recover its revenue requirement, it is not seeking in these proceedings a corresponding base rate increase. Presumably, this is because paragraph five of the Proposal provides that:

During the first five years after the closing, Gulf States will not be allowed to increase its Louisiana retail rates above the level in existence at the date of closing, except under the terms of the force majeure provisionParagraph 8. If rates are reduced during the five years, a subsequent revenue requirement filing could result in an increase in rates but to a level not greater than the original rate ceiling. Because the rate changes resulting from the annual rate filings shall be reflected in a Rider, the Rider during the first five post-merger years can not be a positive value.
L.P.S.C. Order U-19904, Appendix 1, at 2.
[5] The Commission's order provides that:

The principles applicable to these annual reviews set forth in Order No. U-19904-C [sic] state that "b) the Company will not be allowed to defer O & M expenses for the purpose of computing savings under the mechanism set forth in Attachment A." No testimony was presented at hearing to show why deferral of 1994 O & M expenses was not precluded by the principles of Order No. U-19904. GSU stated that in its view, "The O & M expenditures in question for 1994 are functionally identical to these 1993 costs in that they are payroll costs, incurred to produce savings,...." (GSU post hearing brief, p. 52.) The 1993 O & M costs for merger related personnel expenses were disallowed by the Commission in Order No. U-19904-C. Parties acknowledge that these expenses are abnormal and nonrecurring (Commission Post Hearing Brief, p. 19; Tr. Wright, p. 849). Non-recurring expenses are typically not included in rate base. Central Louisiana Electric Co. v. Louisiana Public Service Commission, 508 So.2d 1361 (La.1987) No convincing reason was provided as to why these expenses should not be recovered from GSU's 60% of savings rather than through rate base.
L.P.S.C. Order No. U-21485 at 9-10.
[6] This is presumably because the Commission Staff supported inclusion of the 1994 O & M expenses until the ALJ issued her Proposed Recommendation to disallow the expenses completely. On appeal to the district court, the Company attempted to admit additional evidence, but was opposed by the Commission. See Assignment of Error number nine, infra.
[7] Mr. McGaha admitted that Mr. Kollen selected nuclear units of a similar design. All of the peer group units are Boiling Water Reactors ("BWRs"), having only a single reactor on site. The peer group did not include any Pressurized Water Reactors, which have substantial design differences from BWRs. Rebuttal Test. Mr. McGaha at 20, L.P.S.C. (11/27/95).
[8] Refueling outages adversely affect the capacity factor of a plant because the facility must shut down for a period of time. The capacity factor of a generating unit is the percentage expression of the ratio between the actual number of kilowatt hours generated at the plant, and the number of kWh that could be generated at the plant if it continuously operated at full capacity. A high capacity factor indicates a high kWh output. Therefore, with respect to calculations that are computed on $/kWh basis, plants that have a low capacity factor will compare unfavorably with plants that have a higher capacity factor.
[9] For example, Mr. McGaha testified that the plant was closed in 1993 for several days due to human performance errors, Cross Exam. Mr. McGaha at 240, L.P.S.C. (12/19/95), that Mr. McGaha was actually transferred to the plant because SALP and INPO scores were on a decline and management organization needed improvement, Id. at 241, that "management had not established high standards and expectations and effectively communicated them throughout the plant," Id. at 243, that "[c]orrective actions and root cause analysis at the plant had not been effective enough," Id. at 244, that leadership of the plant needed to be improved to sustain long term improvement, Id. at 245, that human performance weaknesses were high, Id. at 245, that process inefficiencies and deficiencies existed at River Bend which fostered the attitude that, "It's too hard to get things done," Id. at 246, that management had not emphasized reducing backlogs, which were numerous (about 1200) and not satisfactorily prioritized, Id. at 247, that there was an excessive failure by the work force to follow instructions, Id. at 248, that River Bend needed to implement timely corrective actions, Id. at 249, and that an "entitlement" culture existed at River Bend among the employees, Id. at 258.

Much of Mr. McGaha's testimony stems from a self-critical report prepared by Philip D. Graham, ex-Vice President for River Bend Nuclear Group, and presented to the Texas Public Utility Commission. Id. at 249.
[10] In a 1987 rate order affirmed by this Court, the Commission disallowed recovery of a $1.4 billion investment, reasoning that Gulf States could have and should have built a coal plant of the same size as River Bend, which would have saved $1.4 billion. Gulf States Utils., 578 So.2d at 71. Subsequently, the Commission approved a deregulated asset plan, which essentially split up Gulf State's share of River Bend, permitting it to keep most of the benefits of about 150 megawatts of the asset. This approach allowed it to avoid writing off the $1.4 billion disallowance. Gulf States Utils., 676 So.2d at 580.
[11] We note that the testimony of both the Company's expert, Mr. Volpi, and the Commission's expert, Mr. Baron, suggests that Order No. U-20925 factored a 5.5% inflation rate to escalate decommissioning costs, contrary to the actual language of the rate order and the Commission's contention. In any event, the point is not essential to our holding.
[12] To promote capital formation and encourage investment, federal "normalization rules" prevent regulators from setting the utility's rates in a manner that flows the benefits of accelerated depreciation through to ratepayers. I.R.C. §§ 167(1), 168(2) & 168(I)(9).
[13] Alternatively, the NOLs may be deducted from the total amount of deferred tax credits. In either event the result is the same: the rate base is not reduced by the full amount of the accelerated tax deductions to the extent that those tax deductions do not produce cost-free capital.
[14] See supra note 10 and accompanying text for a description of the deregulated asset plan.
[15] Mr. Kollen testified that Mr. Warren's testimony

simply reiterates the same arguments he made in Docket No. U-19904. He takes issue with no direct testimony in this proceeding, but rather rebuts the Commission's order in Docket No. U-19904 (Initial Post Merger Earnings Review), ... and my testimony in the same docket.
Surrebuttal Test. Mr. Kollen at 9, L.P.S.C. (12/11/95). Mr. Warren essentially confirmed this point on cross-examination:
Q. Now, you filed testimony in the first earnings review in this case that is substantially similar to what you filed here; is that correct?
A. In some parts. I would say that the testimony filed in this proceeding was more elaborate and covered some points that were not covered in the first, but substantially similar.
. . .
Q. You ... made arguments in the last case that Mr. Kollen's way of allocating tax deductions to different parts of the plant, to the deregulated asset plan weren't found in the tax laws. Is that right?
A. Yes, that's correct.
Q. Now, is this a true statement: Since the testimony you filed last year, the only additional work you performed consisted of re-reading some testimony, thinking about it some more, but there hasn't been any [substantive] work? Is that a true statement?
. . .
A. Yes, sir, that's correct.
Cross Exam. Mr. Warren at 940-41, L.P.S.C. (1/17/96).
[16] Admittedly, consideration of a utility's financial circumstances typically results from concerns over the Company's ability to finance substantial, long-term projects. In this case, however, the Company is financing smaller, short-term projects. Because the Commission is not required to include short-term CWIP not accruing AFUDC in rate base, the Commission's consideration of the financial integrity of the Company when determining whether to exclude short-term CWIP, a consideration typically reserved for long-term CWIP, enures to the benefit of the Company.
[17] For a hypothetical example, assume a utility has $1,000,000 of equity capital with a 12% cost of capital. Further assume that a utility's debt capital consists of a single $1,000,000 bond with an 8% cost of capital. Using the gross proceeds of debt, the Company would have a capital structure of 50% equity ($1,000,000 equity capital/$2,000,000 total capital) and 50% debt ($1,000,000 debt capital/$2,000,000 total capital). In this example, the utility's average weighted cost of capital would be 10% [(12% × 50%) + (8% × 50%) = 10%]. On the other hand, if the utility's debt capital totaled only $950,000, the utility would have a capital structure of 51.28% equity ($1,000,000 equity capital/$1,950,000 total capital) and 48.72% debt ($950,000 debt capital/$1,950,000 total capital). The utility's average weighted cost of capital would now total 10.05% [ (12% × 51.28%) + (8% × 48.72%) = 10.05%].
[18] Using the preceding hypothetical example in footnote 17, assume the Company issued the $1,000,000 bond, but incurred $50,000 in issuance costs. The Company asserts that its capital structure should reflect only $950,000 in debt capital, i.e. the net proceeds of the bond. Using the net proceeds approach, the Company's average weighted cost of capital would be 10.05%.
[19] Again using the hypothetical example in footnote 17 and assuming the Company issued the $1,000,000 bond and incurred issuance costs of $50,000, the Commission would reflect the full $1,000,000 in the Company's capital structure, i.e. the gross proceeds of the bond. Using the gross proceeds approach, the Company's average weighted cost of capital would be 10%.
[20] On cross-examination, the Commission's expert, Mr. Stephen J. Baron, acknowledged that the Commission used the net proceeds method in the first annual earnings review, but that prior to that in earlier cases involving Gulf States, the Commission had used the gross proceeds method. Cross Exam. Mr. Baron at 58-59, L.P.S.C. (12/19/95). Additionally, Mr. Baron testified that Central Louisiana Electric Corporation also uses the gross proceeds in its current rate proceedings. Mr. Baron, who testified in the first earnings review, stated that he "didn't take issue with [the use of net proceeds in that case] because [he] did not review it, and neither did Mr. Kollen." Id. at 61. He explained that the issue was not examined "because there were a lot of issues in that case." Id.
[21] Alternatively, the Commission asserts that the issue is moot because the Company was satisfied in the third earnings review with the realignment of costs. The record contains no evidence on this point, though, and the Commission fails to point out why the issue does not affect any other portion of the instant rate order.
[22] The entirety of Mr. Gallagher's testimony at the hearings on this issue, which essentially restates his filed testimony, is reproduced below:

Q. Are there any other realignment issues that you are proposing that be considered?
A. There are two. They are very small.
The first one is that the company incorrectly removed from its revenues economy energy adders. When it made its adjustments to synchronize fuel revenues and base revenues. What it did was it allowed the economy energy adder dollars of approximately two million to remain in base rates; therefore, they offset the base rate revenue requirement. Those are fuel revenues and should have been included in the adjustment to remove fuel revenues. Therefore, the economy energy miscalculation has led to an error on the part of the company of about $2 million in its base revenue requirement.
The second one is that when removing fuel expenses that were collectible in the fuel rate, the company inadvertently removed expenses that were not collectible in the fuel rate. They were fuel handling costs, which are not fuel rate expenses, but rather base rate expenses. Therefore, it understated its operating expenses with respect to base rates. That adjustment is worth about $1.9 million to base rates.
Dir. Test Mr. Gallagher at 1107, L.P.S.C. (1/17/96).
[23] As noted in the introduction of this opinion, the Company's right to increase rates during the five years after the merger is restricted by the Proposal.
[24] The Commission does not contend that new adjustments proposed by the Commission Staff and implemented in the proceeding may be made retroactive. For example, the disallowance of excessive nuclear O & M expenses was not made effective back to the date of filing.
[25] The Company seems to concede this point in its brief to the district court, wherein it states that "the Company acknowledges errors and mathematical mistakes, and adjustments that violate sound regulatory principles, may result in retroactive correction to the Company's filing...." Brief on the Merits on Behalf of Entergy Gulf States, Inc., at 105 (4/16/97).
[26] It is unclear why the Company does not appeal all of the retroactive adjustments premised on U-19904-C as a violation of the rule against retroactive ratemaking. Such a comprehensive appeal would at least be consistent with the Company's argument that the Merger Order or Proposal does not preclude the Company from reraising issues decided in previous rate orders. Instead, the Company does not, for example, appeal the retroactive adjustment excluding $0.242 million of merger expense. Because the Company has not appealed these other retroactive adjustments, we need not consider whether they violated the rule against retroactive ratemaking.
[27] The Company's argument to this Court is inconsistent with its argument to the district court. In its district court brief, the Company conceded that "it would be appropriate to implement the adjustment related to NOLs and AMT retroactively to the date of filing in the event that the Commission's position on this issue is upheld in this appeal, as such a decision would, in effect affirm the Commission's order on this issue [rendered] in the First Earnings Review [which the Company did not appeal]...." Brief on the Merits on Behalf of Entergy Gulf States, Inc., at 105 n. 249 (4/16/97). In this Court, the Company now retracts from its position, and argues that it is entitled to reraise the issue in its May 31, 1994 filing without being subject to a refund.
[28] See Assignment of Error number five, supra, for a discussion of the prospective application of the Commission's adjustment excluding CWIP not accruing AFUDC from rate base.
[29] In its district court brief, the Company proposes its own definition of "sound regulatory principles and practices":

Sound regulatory principles and practices may be viewed as those that have traditionally been applied by the LPSC and/or other regulatory commissions, that properly balance the interests of customers and shareholders, and that provide the Company a reasonable opportunity to recover its prudently incurred costs and earn a fair and reasonable return.
Brief on the Merits on Behalf of Entergy Gulf States, Inc., at 106 (4/16/97) (emphasis added). Thus, under the Company's own definition, inclusion of CWIP not accruing AFUDC is not a sound regulatory principle or practice, as the "Commission's traditional policy," according to the Company, is to exclude such CWIP.
[30] The public policy behind this consideration is strongly evidenced by the legislature's command that appeals of Commission orders "shall be given precedence over all other civil cases in the court, and shall be heard and determined as speedily as possible." La.R.S. 45:1192.
[31] In his dissent, Justice Lemmon suggests that "the excluded evidence may well have swung the balance in favor of the Company and should have been admitted." A careful review of the proffered, prepared testimony reveals that it adds no additional legitimate evidence which would justify further delaying this case. The expert merely rehashes the opinions of the Company's other expert and the arguments set forth in the Company's brief. It is abundantly clear in this instance that the probative value of the testimony  testimony which was proffered on appeal and readily available to the Company during Commission hearings  is substantially outweighed by considerations of undue delay and waste of time. At this late stage, it is important to be especially aware of needless delay that would be occasioned by remand to the Commission and subsequent review by the district court. The Merger Order and Proposal require that the Company's filing be reviewed promptly and that savings be promptly passed on to ratepayers. Even the dissent impliedly agrees that it is within a district court judge's discretion, in a case such as this, to exclude evidence based upon article 403.
[1] This view is consistent with my vote to grant the Company's application for supervisory writs that was presented to this court immediately after the trial judge ruled.